UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| KARLA STEIMEL, ON HER OWN BEHALF AND ON BEHALF OF A CLASS OF THOSE SIMILARLY SITUATED, | ) ) ) | |
| *Plaintiffs*, | ) | 1:13-cv-957-JMS-MJD |
| | ) | |
| *vs.* | ) | |
| | ) | |
| DEBRA MINOTT, IN HER OFFICIAL CAPACITY AS SECRETARY OF THE INDIANA FAMILY AND SOCIAL SERVICES ADMINISTRATION, *ET AL.*, | ) ) ) | |
| *Defendants*. | ) | |

**ORDER**[1]

For a number of years, the Indiana Family and Social Services Administration ("FSSA")
had a policy in place that allowed developmentally disabled individuals to receive Medicaid
waiver services through a waiver program for which they were ineligible.  To remedy this prob-
lem, the FSSA changed its policy and began transitioning the inappropriately placed individuals
to another waiver program designed to serve their needs.  This transition allegedly caused many
developmentally disabled individuals to face a reduction in services.  This suit challenges the
FSSA's policy change.

Plaintiff Karla Steimel brings this action on behalf of herself and a class of those similar-
ly situated (collectively, "Plaintiffs") against Defendants Debra Minott, Secretary of the Indiana
Family and Social Services Administration ("FSSA"); Nicole Norvell, Director of the Division
of Disability and Rehabilitative Services of the FSSA; and Faith Laird, Director of the Division
of Aging of the FSSA (collectively, "the State"), alleging violations of the Americans with Disa-

---

[1] As part of the Court's pilot program regarding hyperlinking in Court filings, this Order contains
hyperlinks to documents previously filed in this case, and to legal authority.  Instead of the cita-
tion format "dkt. __ at __," the Court now uses "Filing No. __, at ECF p. __" as its citation for-
mat.

bilities Act of 1990 ("ADA") and the Rehabilitation Act of 1973. [Filing No. 1.]  Presently pending before the Court are Plaintiffs' Motion to Certify Class, [Filing No. 3], and a Motion for Permissive Intervention and to Join in Pending Motion for Class Certification filed by Intervenor Plaintiffs Thomas Maertz, Colton Cole, Cody Cole, and Timothy Keister, [Filing No. 88].  The Court held a hearing on these motions during which counsel for each side presented argument. [*See* Filing No. 108.]  For the reasons that follow, the Court **DENIES** the Motion to Certify Class, [Filing No. 3], and **GRANTS** the Motion for Permissive Intervention and to Join in Pending Motion for Class Certification, [Filing No. 88].

## I.
### STANDARD OF REVIEW

In deciding whether to certify a class, the Court may not blithely accept as true even the most well-pleaded allegations of the complaint, but must instead "make whatever factual and legal inquiries are necessary under Rule 23" to resolve contested issues.  *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 676 (7th Cir. 2001); *see Parko v. Shell Oil Co.*, 739 F.3d 1083, 1085 (7th Cir. 2014).  Specifically, the Court must find that the putative class satisfies the four prerequisites set forth in Federal Rule of Civil Procedure 23(a).  If the putative class does satisfy these prerequisites, the Court must additionally find that it satisfies the requirements set forth in Federal Rule of Civil Procedure 23(b), which vary depending upon which of three different types of classes is proposed.

Before addressing the Rule 23 factors, however, the Court must examine whether the proposed class members are sufficiently definite.  To do so, "[t]he plaintiff must . . . show . . . that the class is indeed identifiable as a class."  *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006).  When "there is no way to know or readily ascertain who is a member of the class," the class "lacks the definiteness required for class certification."  *Jamie S. v. Milwaukee Public*

*Schools*, 668 F.3d 481, 495 (7th Cir. 2012). If the class as defined is sufficiently definite, the Court turns next the Rule 23(a) factors.

It is the plaintiff's burden to prove that an identifiable class exists that qualifies for certification under Rule 23(a). *Oshana*, 472 F.3d at 513. The four prerequisites under Rule 23(a) are: "(1) [that] the class is so numerous that joinder of all members is impracticable; (2) [that] there are questions of law or fact common to the class; (3) [that] the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) [that] the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). Class certification is not appropriate unless the named plaintiff establishes all four prerequisites. *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012).

In addition to meeting the prerequisites of Rule 23(a), the proposed class must satisfy one of the conditions of Rule 23(b). *Messner*, 669 F.3d at 811; *Oshana*, 472 F.3d at 513. Under Rule 23(b), a class action that satisfies Rule 23(a) may be sustained if one of the following is true: "(1) prosecuting separate actions by or against individual class members would create a risk of: (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests; (2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or (3) the court finds that the questions of law or fact common to class members predominate over any questions af-

fecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(1-3).

## II.
### BACKGROUND

This case involves Medicaid waiver programs funded jointly by the federal government and the state of Indiana. These programs allow states such as Indiana to waive certain federal Medicaid requirements. *See generally* 42 U.S.C. § 1396n. A subset of these programs—home-and-community-based waiver programs—"permit[] a State to furnish an array of home and community-based services that assist Medicaid beneficiaries to live in the community and avoid institutionalization." [Filing No. 58-5, at ECF p. 8.] The FSSA submits waivers for approval to the United States Department of Health and Human Services ("DHHS"). [Filing No. 58-2, at ECF p. 4.] Relevant to this litigation are three such waiver programs currently administered by the FSSA: the Aged and Disabled Waiver ("A&D Waiver"), the Community Integration and Habilitation Medicaid Waiver ("CIH Waiver") and the Family Supports Medicaid Waiver ("FS Waiver"). [Filing No. 58-2, at ECF p. 4; Filing No. 58-4, at ECF p. 4.] The FSSA's Division of Aging administers the A&D Waiver, while the FSSA's Bureau of Developmental Disabilities Services ("BDDS") administers the CIH Waiver and the FS Waiver. [Filing No. 58-2, at ECF p. 4; Filing No. 58-4, at ECF p. 4.] An individual may only be enrolled in (and thus receive services from) one waiver program at a time. [Filing No. 58-2, at ECF p. 4.]

Individuals enrolled in any of the waiver programs receive a case manager. [Filing No. 58-2, at ECF p. 6; Filing No. 58-4, at ECF p. 6.] To determine both the type and amounts of services an enrollee will receive through the waiver program, the case manager, the enrollee, and the enrollee's guardian evaluate the enrollee's particular circumstances to identify the enrollee's specific needs. [Filing No. 58-2, at ECF p. 6; Filing No. 58-4, at ECF p. 6.] The enrollee then

submits her plan to the appropriate administrating agency—either the Division of Aging or BDDS—which can either approve or deny the request for services. [Filing No. 58-2, at ECF p. 6; Filing No. 58-4, at ECF p. 6.]  An enrollee must have her requested services approved annually by the appropriate agency. [Filing No. 58-2, at ECF p. 6; Filing No. 58-4, at ECF p. 6.]

A basic understanding of each waiver is necessary to understand the events underlying this suit.  The A&D Waiver "provides an alternative to nursing facility admission for adults and persons of all ages with a disability," specifically by providing services "for people who would require care in a nursing facility if waiver or other supports were not available." [Filing No. 58-5, at ECF p. 12.]  When an individual's A&D Waiver plan is approved by the Division of Aging, she is provided a list of the A&D Waiver services approved and her waiver budget for that year. [Filing No. 58-2, at ECF p. 7.]  The approved services are reimbursed at rates set by the Division of Aging. [Filing No. 58-2, at ECF p. 6.]  Although A&D Waiver enrollees receive a specific budget amount each year, they need not use services such that they spend the entire allocated budget. [Filing No. 95-1, at ECF p. 2.]  The A&D Waiver has a limited number of individuals that it can serve, but it is not currently at capacity. [Filing No. 58-2, at ECF p. 5.]

Both the FS Waiver and CIH Waiver provide "waiver services to participants . . . in a range of community settings as an alternative to care in an intermediate care facility" to persons "with a developmental disability, intellectual disability . . . or autism." [Filing No. 58-7, at ECF p. 8; Filing No. 58-8, at ECF p. 8.]  While the A&D Waiver is limited to those who require nursing-facility level of care, the FS Waiver and the CIH Waiver serve individuals who require a different level of care: "intermediate care facility for individuals with intellectual disabilities" ("ICF/IID"). [Filing No. 58-7, at ECF p. 7; Filing No. 58-8, at ECF p. 7.]  Like the A&D Waiver, the FS Waiver and the CIH Waiver are reimbursed at set rates, [Filing No. 58-9, at ECF p. 9-

10], albeit not the same rates as services under the A&D Waiver, [Filing No. 58-9, at ECF p. 2-4], and an enrollee has a services budget approved at least on an annual basis, [Filing No. 58-4, at ECF p. 6-7].  The FS Waiver currently caps enrollee's budgets at $16,250 per year.  [Filing No. 58-4, at ECF p. 18.]  The CIH Waiver, however, has a much higher budget cap, [Filing No. 30-1, at ECF p. 2], given that it is a needs-based waiver and "individuals must meet emergency placement criteria to access [it]."  [Filing No. 58-9, at ECF p. 77.]  The amount of services available under each of the three waivers is impacted by the statutory requirements that each waiver be cost-neutral compared to the cost of serving these enrollees through a traditional Medicaid institutional placement.  *See* 42 U.S.C. § 1396n(c)(2)(D) (requiring that under each "waiver the average per capita expenditure estimated by the State in any fiscal year for medical assistance provided with respect to such individuals does not exceed 100 percent of the average per capita expenditure that the State reasonably estimates would have been made in that fiscal year for expenditures under the State plan for such individuals if the waiver had not been granted").

From 2006 to 2011, FSSA policy permitted individuals with developmental disabilities to be placed on the A&D Waiver even if they did not meet nursing-facility level of care.  [Filing No. 58-9, at ECF p. 27-32 (2006 A&D Waiver Policy Statement).]  This decision contradicted the express terms of the A&D Waiver approved by DHHS, which limited the A&D Waiver to individuals requiring nursing-facility level of care.  [Filing No. 58-5, at ECF p. 11.]  In October 2011, the Division of Aging instituted a new policy that is the subject of this litigation ("2011 Policy Change").  [Filing No. 58-9, at ECF p. 32.]  The 2011 Policy Change rescinded the FSSA's prior policy of allowing individuals with a developmental disability to enroll in the A&D Waiver even if they did not require nursing-facility level of care.  [Filing No. 58-9, at ECF p. 32.]  Because some individuals on the A&D Waiver did not meet that level of care, the Division

- 6 -

of Aging needed to transition enrollees to another waiver for which they were eligible.  [Filing No. 58-2, at ECF p. 12.]  Specifically, the Division of Aging sought to transition those no longer eligible for the A&D Waiver to either of the two waiver programs administered by BDDS: the FS Waiver or the CIH Waiver.  [Filing No. 58-2, at ECF p. 12.]

     Individuals on the A&D Waiver that were no longer eligible were not instantly transitioned off the A&D Waiver.  Instead, they remained—and many still remain—on the A&D Waiver until they were "targeted"[2] for transition to the FS Waiver.  [Filing No. 58-2, at ECF p. 12-13.]  As stated by the FSSA, "[s]ome individuals currently served through the A&D Waiver no longer meet Nursing Facility level of care but do continue to require assistance with activities of daily living due to a reported developmental disability.  These individuals have been notified by their case manager that they no longer meet [Nursing Facility] level of care and may continue to receive services through the A&D Waiver as they wait to be targeted for the [FS Waiver]."  [Filing No. 58-9, at ECF p. 76.]  Although technically an individual could transition from the A&D Waiver to either the FS Waiver or the CIH Waiver, the FSSA required individuals who must be transitioned off the A&D Waiver to go through an evaluation for placement on the FS Waiver.[3]  [Filing No. 58-2, at ECF p. 13.]  If the evaluation revealed that the individual's level of care rendered her eligible for the FS Waiver, she would be targeted for that waiver once a slot became available.  [Filing No. 58-4, at ECF p. 11.]  The FSSA acknowledges that it would be the "rare" occasion that an individual requiring nursing-facility level of care would not also meet the level of care required to be eligible for the FS Waiver and CIH Waiver.  [Filing No. 58-2, at ECF

---

[2] "Targeting" is a term of art employed by FSSA to connote FSSA's act of informing an individual that they are eligible to be transitioned from the waiver waitlist onto the waiver. [ Filing No. 58-4, at ECF pp. 9-10.]

[3] Individuals were "required" to undergo this FS Waiver evaluation in the sense that if they failed to do so, their A&D Waiver services would be terminated and they would not be placed in an alternative waiver program.  [Filing No. 58-2, at ECF p. 13.]

p. 15.]  Unlike the FS Waiver, individuals transitioned off the A&D Waiver due to the 2011 Pol-

icy Change are not targeted for placement on the CIH Waiver.  [Filing No. 58-4, at ECF p. 12.]

Instead, an individual seeking placement on the CIH Waiver must file a "request for review,"

during which BDDS determines whether the individual meets the needs-based criteria required

for enrollment on the CIH Waiver.  [Filing No. 58-4, at ECF p. 12.]

### III.
### DISCUSSION

The Court begins briefly with the pending Motion for Permissive Intervention and to Join

in Pending Motion for Class Certification.  [Filing No. 88.]  Thomas Maertz, Colton Cole, Cody

Cole, and Timothy Keister seek to intervene in this action as plaintiffs and seek to join in the

pending Motion to Certify.  [*See* Filing No. 88, at ECF p. 1-2.]  They seek to do so not only to

vindicate their own rights, but also to serve as class representatives.  [Filing No. 88, at ECF p. 1.]

The State criticizes but does not opposite the motion, and the Court therefore grants it as unop-

posed.

The Court turns next to Plaintiffs' Motion to Certify.  Plaintiffs seek to certify the follow-

ing class:

> Any and all persons, current and future, terminated from the A&D Waiver as a re-
> sult of the 2011 Policy Change who require more services each year than are
> available through the FS Waiver and who are not enrolled in the CIH Waiver.

[*See* Filing No. 74, at ECF p. 24 (setting forth the proposed class definition); Filing No. 105, at

ECF p. 14 (suggesting a modification to the class definition set forth in the supplemental opening

brief).]  First, the Court addresses whether this putative class is sufficiently ascertainable.  Next,

the Court discusses the Rule 23(a) prerequisites to class certification.  Finally, the Court analyzes

whether the putative class meets Rule 23(b)(2).  In the end, the Court concludes that the class is

not sufficiently ascertainable, does not meet the four Rule 23(a) requirements, and is not certifia-

ble under Rule 23(b)(2).  For each of these reasons, the Court declines to certify the putative class.

### A.    Ascertainability and Indefiniteness

The ascertainability or definiteness (two terms used interchangeably) of a class is not a prerequisite for class certification enumerated in the Federal Rules, but the Seventh Circuit has made clear that it is nonetheless a requirement for class certification.  *See Jamie S.*, 668 F.3d at 495 (declining to certify a putative class because, among other reasons, the class was "fatally indefinite").  To meet this requirement, "[t]he plaintiff must . . . show . . . that the class is indeed identifiable as a class." *Oshana*, 472 F.3d at 513.  When "there is no way to know or readily ascertain who is a member of the class," the class "lacks the definiteness required for class certification." *Jamie S.*, 668 F.3d at 495; *see Adashunas v. Negley*, 626 F.2d 600, 604 (7th Cir. 1980) (holding that "the proposed class of plaintiffs is so highly diverse and so difficult to identify that it is not adequately defined or nearly ascertainable" to warrant certification).

The parties vigorously dispute whether the class is sufficiently definite.  The State points to several difficulties with the class definition that preclude its members' identification.  [Filing No. 97, at ECF p. 18-27.]  First, the State argues that the individuals who meet the class definition must be identified by reviewing the file of each individual enrolled in the A&D Waiver—approximately 14,000 files.  [Filing No. 97, at ECF p. 20-21 (citing Filing No. 95-1, at ECF p. 1).]  This file review is required, says the State, because those terminated from the A&D Waiver due to the 2011 Policy Change are necessarily those individuals on the A&D Waiver that have a developmental disability, thus each file must be examined to check for such a diagnosis.  [Filing No. 97, at ECF p. 20-21.]  The State maintains that this process is more cumbersome than merely checking an electronic database to see if a developmental disability is listed.  Each enrollee's

electronic file contains a maximum of three diagnoses.  If a developmental disability is not of the diagnoses maintained electronically an examination of each enrollee's full file would have to be conducted to determine the first requirement of class membership.  [Filing No. 97, at ECF p. 20-21.]  Second, the State focuses specifically on the portion of the class definition that putative class members are those "who require more services each year than are available through the FS Waiver."  [*See* Filing No. 97, at ECF p. 21-25.]  According to the State, determining whether an individual *requires* more services than offered through the FS Waiver—which is capped at $16,250 per year in services, [Filing No. 58-4, at ECF p. 18]—"is extremely complicated, individualized, fluctuating, and subjective," for three reasons: (1) an individual's last A&D Waiver budget is an inadequate proxy for services that an individual will require on the FS Waiver; (2) services available on the A&D Waiver and not the same as those available on the FS Waiver; and (3) budgeted dollars on the FS Waiver are not equivalent to budgeted dollars on the A&D Waiver because of differing approved rates, [Filing No. 97, at ECF p. 21-22.]

Plaintiffs respond with several arguments.  First, Plaintiffs contend that the State overlooks that Plaintiffs seek certification pursuant to Rule 23(b)(2) rather than Rule 23(b)(3), and that "ascertainability arguments are entitled to little weight where certification is sought under Rule 23(b)(2)."  [Filing No. 105, at ECF p. 3.]  Second, Plaintiffs argue that any difficulty that exists in identifying class members stems from the State's own failure to track those affected by the 2011 Policy Change, and thus these difficulties should not preclude certification.  [Filing No. 105, at ECF p. 7-8.]  Third, Plaintiffs maintain that "the key [inquiry] is simply whether a person's membership in the class may be ascertained by reference to objective criteria," and that all of the criteria in the proposed class definition are indeed objective.  [Filing No. 105, at ECF p. 9.]  Finally, Plaintiffs argue that if determining what services an individual "requires" precludes

class certification, "vindication of class-wide harms [would be] virtually impossible in a wide range of cases," and in any event, the class definition "simply accepts the determination of individuals' needs that have already been made by the State" when their A&D Waiver budgets were previously approved by the State. [Filing No. 105, at ECF p. 10-11.]

The Court must first briefly address Plaintiffs' position that the ascertainability requirement is relaxed—if not unnecessary—when, as here, certification is sought pursuant to Rule 23(b)(2). Although Plaintiffs cite numerous out-of-circuit precedents and district court cases supporting their position, [*see* Filing No. 105, at ECF p. 4-5], Seventh Circuit authority—which, of course, binds this Court—belies Plaintiffs' argument. Indeed, as Plaintiffs recognize, the Seventh Circuit in *Jamie S.* rejected class certification on ascertainability grounds even though certification was sought pursuant to Rule 23(b)(2). *See* 668 F.3d at 495-96, 498-99. And nothing in *Jamie S.* even implicitly suggests that a relaxed ascertainability standard applies to Rule 23(b)(2) classes. *See also* Adashunas, 626 F.2d at 604-05 (rejecting class certification in a Rule 23(b)(2) case on ascertainability grounds without suggesting that a relaxed ascertainability standard applies). Had a relaxed standard applied, the Seventh Circuit would have explained why the putative class did not even meet that standard, but it did not. The Court therefore rejects Plaintiffs' argument that a relaxed ascertainability standard should apply in this case and instead applies the ascertainability requirements set forth by the Seventh Circuit.

The parties' remaining arguments focus on whether the members of the putative class are indeed identifiable. For several reasons, the Court concludes that they are not. Specifically, the Court concludes that identifying putative class members who require more services each year than are available through the FS Waiver is a "complex, highly individualized task, and cannot be reduced to the application of a set of simple, objective criteria." *Jamie S.*, 668 F.3d at 496.

Plaintiffs resist this conclusion by arguing that the services an individual "require[s]" is already known in that "the State has already made this determination" when the individual's A&D Waiver budget was approved by the State according to what services she "needs to remain safely and securely in the community." [Filing No. 105, at ECF p. 10-11.] Notably, this is the only method by which Plaintiffs suggest this determination—necessary for class membership—can be made. But the Court agrees with the State that the previously approved A&D Waiver budget is an inappropriate proxy for determining whether an individual requires more services each year than are available through the FS Waiver, rendering the identities of class members unascertainable short of a complex, highly individualized review of each A&D Waiver enrollee's particular needs.

The evidence before the Court suggests that a single-year's A&D Waiver budget approval is an inaccurate measure of what an individual will require when enrolled in the FS Waiver. Several examples are illustrative of its inaccuracy as a proxy. First, as the State contends, "[b]udgets—in other words, approved services—are not an accurate reflection of what services a waiver enrollee actually uses." [Filing No. 97, at ECF p. 22.] The State points to four illustrative examples of enrollees whose approved budget was significantly greater than the services he or she utilized: (1) A&D Waiver budget of $18,836.63, yet utilized $8,282.57 in waiver services, [Filing No. 96-1, at ECF p. 6]; (2) A&D Waiver budget of $18,478.70, yet utilized $8,845.99 in waiver services, [Filing No. 96-1, at ECF p. 3]; (3) A&D Waiver budget of $30,228.48, yet utilized $16,674.98 in waiver services, [Filing No. 96-1, at ECF p. 2]; and (4) A&D Waiver budget of $19,526.40, yet utilized $15,494.76 in waiver services, [Filing No. 96-1, at ECF p. 7].

Plaintiffs do not dispute that utilization levels are often lower than the allotted A&D Waiver budget. Instead, they argue that the undisputed evidence remains that the approved A&D

Waiver budget amount is "based on the State's own determination of what an individual needs." [Filing No. 105, at ECF p. 12.]   While this may be true, utilization more accurately reflects whether an individual truly *requires* "more services each year than are available through the FS Waiver"—which is the operative question in identifying putative class members.

FS Waiver budgets are capped at $16,250.00.   [Filing No. 58-4, at ECF p. 18.]   Three of the four individuals discussed above—the first, second, and fourth—despite having A&D Waiver budgets greater than $16,250.00, utilized less than this amount in services.   Even assuming the past year is an accurate reflection of an individual's needs, these individuals could utilize the exact same amount of services on the FS Waiver as they did on the A&D Waiver.   This is the proper frame of reference because—despite the amount approved by the State—if an individual only uses services in an amount available under the FS Waiver it cannot be said that the 2011 Policy Change impacted them at all.   Such individuals would fall within Plaintiffs' class definition but would not be harmed by the State's conduct.   *Cf. Messner*, 669 F.3d at 824-25 (cautioning against certifying an overly broad class that "would contain a vast number of people who *could not* have been harmed") (emphasis added).   Simply stated, it cannot be said that an individual *requires* more services than available under the FS Waiver when they utilized an amount of services available on the FS Waiver.

Plaintiffs further respond by attempting to explain why these individuals underutilized their budgets.   For example, Plaintiffs point to evidence that two of the individuals "underutilized services because their provider was unable to staff the full level of services for which they were

approved."[4]  [Filing No. 105, at ECF p. 12-13 (citing Filing No. 104-3, at ECF p. 2-3).]  Knowing the cause of the underutilization, however, does not undermine the fact that utilization more accurately captures the amount of services the individual requires, as she will still have access to that amount of services on the FS Waiver.  If anything, Plaintiffs' recognition that there are many reasons services might be underutilized in a given year, [see Filing No. 105, at ECF p. 13], reinforces Defendants' position that determining whether an individual requires more services than available on the FS Waiver is a highly individualized inquiry that must be conducted on a case-by-case basis.

The foregoing discussion is all merely to say that one's A&D Waiver budget is not an adequate proxy for the services one requires.  It is true, however, that if utilization is the proper measure of requirement, one could simply look to an enrollee's utilization level to determine whether they fall within the class, rather than, as Plaintiffs' suggest, looking at her approved budget.  The Court could alter the class definition to remedy this problem, but the evidence suggests that utilization amounts would not serve as an adequate proxy either.  This is demonstrated by, among other things, the fact that an individual's A&D Waiver budget for a single year could include one-time expenses such as home modifications that, if utilized, will not be required in subsequent years.  [Filing No. 97, at ECF p. 23.]

For example, one representative enrollee's A&D Waiver budget for one year was $21,015, but $13,695 of that was earmarked for a home modification.  [Filing No. 96-1, at ECF p. 4.]  The home modification portion of the budget, however, was never spent, thus the individ-

---

[4] Plaintiffs make this argument, as well as many others, with respect to the Rule 23(a) requirements because, in their view, many of the State's arguments regarding ascertainability are actually pertinent only to the Rule 23(a) requirements.  [See Filing No. 74, at ECF p. 11.]  The Court disagrees, finding many of the State's arguments relevant to ascertainability and thus considers Plaintiffs' responsive arguments in this section.

ual only utilized $6,125.56 in waiver services that year.  [Filing No. 96-1, at ECF p. 4.]  During the next budget year, the individual's A&D Waiver budget was $18,112.60, a substantial portion of which was earmarked for a home modification and, this time, was utilized in its entirety. [Filing No. 96-1, at ECF p. 5.]  This example persuasively demonstrates why determining the services an individual will require on the FS Waiver cannot be done by simply looking back to a particular year's approved A&D Waiver budget or a particular year's utilized services.  Instead, it will require an individualized assessment of each class member's specific and changing needs.

Even if the above articulated concerns were not present, other difficulties prevent the A&D Waiver budget or utilization amount from functioning as an adequate proxy for the services an individual will require on the FS Waiver.  To conclude otherwise would be to ignore the meaningful qualitative differences in the services offered under the two waiver programs.  The A&D Waiver "provides an alternative to nursing facility admission for adults and persons of all ages with a disability," specifically by providing services "for people who would require care in a nursing facility if waiver or other supports were not available," [Filing No. 58-5, at ECF p. 12], while the FS Waiver provides services to persons "with a developmental disability" "in a range of community settings as an alternative to care in an intermediate care facility," [Filing No. 58-7, at ECF p. 8].  The differences in populations each waiver program is designed to serve make services approved and utilized on one waiver a misleading measure of what services one will require on the other.  [Filing No. 95-1, at ECF p. 2 ("The services available on the A&D Waiver are best suited to serve individuals who require nursing-facility level of care.  The A&D Waiver is ill-equipped to address the needs of individuals with developmental disabilities who only meet ICF/IID level of care.").]  Indeed, "[d]ue to the nature of the services available on the A&D Waiver, for individuals enrolled on the A&D Waiver with specialized needs based on a devel-

- 15 -

opmental-disability diagnosis, care plans/budgets are more often focused on caregiver needs than the needs of the waiver enrollee because those are needs A&D waiver services do not address." [Filing No. 95-1, at ECF p. 2.]

Plaintiffs contend that the qualitative differences between the two budgets are overstated. [Filing No. 105, at ECF p. 22.]  For example, Plaintiffs reviewed a ten-enrollee sample of putative class members, which revealed that eight of the ten "received services through the FS Waiver virtually identical in kind to services that could be received through the A&D Waiver." [Filing No. 105, at ECF p. 22 (citing Filing No. 59-39).]  This sample, however, proves the State's point.  Even if there is a substantial overlap in the services, they certainly are not identical.  Thus, whether one looks to an enrollee's past A&D Waiver budget or utilization amounts while enrolled in the A&D Waiver, neither are an appropriate measure of the services one will require when on the FS Waiver, as both parties acknowledge that precisely the same services are not offered.  And indeed, putative class members are already receiving different services on the FS Waiver than they were on the A&D Waiver.  [Filing No. 105, at ECF p. 22.]  These qualitative differences in the services offered under the FS Waiver and the A&D Waiver preclude use of a previous year's A&D Waiver budget or utilization levels as an appropriate proxy for determining whether an individual requires more services than offered under the FS Waiver.

The State also points to the fact that specific services that are provided under both waivers are not reimbursed at the same rates, such that $1 of A&D Waiver services is not equivalent to $1 of FS Waiver services.  [*Compare* Filing No. 58-9, at ECF p. 2-4 (A&D Waiver Reimbursement Rates), *with* Filing No. 58-9, at ECF p. 9-10 (FS Waiver and CIH Waiver Reimbursement Rates).]  Plaintiffs acknowledge this is true, and suggest that any difficulties this posed could simply be solved by replacing "who require more than $16,250.00 a year in waiver

services" in their originally proposed class definition with "who requires more services each year than are available through the [FS] Waiver." [Filing No. 105, at ECF p. 14.]  The Court has incorporated this change to Plaintiffs' proposed class definition, but cannot conclude that this change makes the putative class members any more ascertainable.  The fact remains that the only method by which Plaintiffs suggest the services an individual "requires" can be ascertained is by using a previous year's A&D Waiver budget as a proxy and simply looking to whether that budget is greater than the $16,250.00 cap on services under FS Waiver (assumingly, after one adjusts for the difference in reimbursement rates).  But for all of the reasons set forth above, the A&D Waiver budget or utilization levels are inapt proxies for determining whether an individual requires more services than he or she can access on the FS Waiver.

Plaintiffs resist this conclusion on yet another ground, contending that the difficulty in identifying the services an enrollee will require on the FS Waiver budget goes not to ascertainability but to "difference[s] in relief amongst class-members," which concerns the Court's analysis of "numerosity, commonality, and/or typicality."  [Filing No. 105, at ECF p. 11.]  All that the Court must decide regarding ascertainability, say Plaintiffs, "is simply whether the class is defined by reference to objective criteria," and "[t]he level of an enrollee's needs—what that person 'requires'—*is* an objective criterion . . . that is made by the State at least once a year for every individual enrolled in its waiver programs." [Filing No. 105, at ECF p. 11 (emphasis in original).]  But this is simply a restatement of Plaintiffs' position that the State's approval of an individual's A&D Waiver budget can be used as a proxy for the services one will require under the FS Waiver—an argument the Court has already rejected.

This would be a different case had the determination on which class membership depended—*i.e.*, the services one requires under the FS Waiver—already been made by the State in some

fashion.  This was the case in *N.B. v. Hamos*, --- F.Supp.2d ----, 2014 WL 562637, at *4-5 (N.D. Ill. 2014)*, where the court certified a class of Medicaid enrollees and rejected the defendant's argument that the putative class was unascertainable.  There, the court recognized that "the diagnosis of mental and behavioral disorders is plainly an individualized and child-specific undertaking," but reasoned that "the class definition proposed in this case presupposes such a diagnosis as a condition of class membership."  *Id.* at *5.  It did so, the court continued, because "[t]he statutory scheme at [issue] provides the mechanism for identifying children in need of mental health services, [and] . . . [o]nce a child has been diagnosed as requiring such services . . . , he or she is entitled under the law to whatever services their doctors have recommended for maximum improvement."  *Id.*  This distinguished *Jamie S.*, the court reasoned, "where membership in the class could not be determined without individualized, court-approved assessments;" unlike in *Jamie S.*, "once the class members have been identified—through the workable criteria set forth in the statute and adopted by Illinois regulation, not through a determination of the Court—the required treatment is not subject to further inquiry."  *Id.*  Specifically, "[b]y accepting Medicaid funds, the State already has agreed to the standard defining what mental health treatment is 'medically necessary,'" and thus "[t]here will be no need for the Court to monitor and review the propriety of those determinations."  *Id.* at *7.  Other cases on which Plaintiffs rely have this same element not present here: a statute, regulation, or other mechanism readily determines class membership.  *See, e.g.*, *A.M.T. v. Gargano*, 2010 WL 4860119, at *3 (S.D. Ind. 2010)* (holding that members of a putative class of children Medicaid recipients were ascertainable because "the key inquiry will be whether the FSSA denied all or part of an enrollee's therapy request pursuant

- 18 -

to § (b)(6) or § (b)(7)[, which] . . . can be determined by . . . [the] FSSA's denial notices indicating its reasons for denying the requested treatments").[5]

This case is like *Jamie S.* and distinguishable from *Hamos* in that the State here has not already made the determinations necessary to conclude whether an individual requires more services each year than are available through the FS Waiver.  In other words, contrary to Plaintiffs reliance on *Hamos*, the class definition does not "presuppose[]" that the necessary determinations have already been made.  *Hamos*, 2014 WL 562637, at *5.  Plaintiffs try to fit this class into *Hamos*'s reasoning by pointing to the prior A&D Waiver budget allotment as an already determined measure of the putative class members' needs.  But for all the reasons discussed above, the prior A&D Waiver budget is not an adequate proxy for the services one will require on the FS Waiver and thus in no sense does the class definition in this case merely utilize a determination already made by the State.

This case is instead like *Jamie S.*, as individuals who require more services than are available under the FS Waiver are "*not identified* and *remain unidentified.*"  668 F.3d at 495 (emphasis in original); *see Adashunas*, 626 F.3d at 603 ("How does one identify class members consisting of persons not identified?").  Indeed, these individuals will only be identified by an individualized case-by-case assessment of the needs of every enrollee terminated from the A&D

---

[5] At the hearing, Plaintiffs suggested that the law should not encourage governmental entities to avoid class certification by obscuring the bases for their decisions.  But merely because the State provided the individuals in *A.M.T.* with the basis for its decision, which permitted the putative class to be identified with ease, does not mean the converse is true—that obscuring the basis for a decision would lead to the denial of certification.  Furthermore, the Court's ultimate conclusion in this case that the putative class is not sufficiently ascertainable is not reached due to the State's intentional withholding of information or negligent recordkeeping.  While the Court is somewhat surprised that the FSSA does not have more readily available information regarding the complete diagnoses of the enrollees in its waiver programs than it does, there is no reason to think that the State would have had reason to manage their databases in the manner desired by the Plaintiffs.

Waiver program.  A putative class is not sufficiently ascertainable if such a process is required.
*See Jamie S.*, 668 F.3d at 496 ("[I]dentifying disabled students who might be eligible for special-education services is a complex, highly individualized task, and cannot be reduced to the application of a set of simple, objective criteria.  Every step of the child-find inquiry and IEP process under the IDEA is child specific and requires the application of trained and particularized professional educational judgment."); *Bowman v. IBM Corp.*, 1:11-cv-593-RLY-TAB, Dkt. 307 at 13 (S.D. Ind. 2013) (relying on *Jamie S.* in holding that the putative class was not ascertainable because "[s]everal steps across multiple programs are necessary to determine which individuals had their benefits improperly interrupted.  Further, individuals with particularized knowledge of both Medicaid and the corresponding computer systems would be forced to make a subjective interpretation of handwritten notes, among other items, in deciding who belonged in the class.  This is far from a mere reference to objective criteria to determine the class.").

Plaintiffs are incorrect that concluding this class is not sufficiently ascertainable "would make vindication of class-wide harms virtually impossible in a wide range of cases."  [Filing No. 105, at ECF p. 10.]  It is the particular factual peculiarities of this case that make the putative class members unascertainable.  If, for example, the State eliminated certain services provided under the FS Waiver and Plaintiffs challenged that elimination, crafting an ascertainable class would in all likelihood be a relatively straightforward task.[6]  But this is not what occurred.  After five years of allowing individuals with developmental disabilities who did not meet nursing-facility level of care to receive services under the A&D Waiver—which, by the express terms agreed to by the State and federal government, the A&D Waiver did not permit, [Filing No. 58-5,

---

[6] The Court does not suggest or offer a view on whether such a class would otherwise be certifiable, only that a stronger argument could be made that the putative class members are ascertainable.

at ECF p. 11]—the State issued the 2011 Policy Change to comply with the terms of the agreed-upon waiver, [Filing No. 58-9, at ECF p. 32]. As a result of the 2011 Policy Change, individuals who were improperly receiving waiver services under the A&D Waiver, were targeted for transition to the more limited FS Waiver—that is, a waiver program designed to serve individuals requiring their level of care. [Filing No. 58-8, at ECF p. 7] The State's initial error and subsequent correction created the rather peculiar situation underlying this case: individuals may suffer overall service reductions, yet the Court is bereft of a classwide method by which to measure whether an individual requires more services than those offered on the FS Waiver.

Having concluded that Plaintiffs' proposed method of determining the services an individual requires on the FS Waiver is inadequate, the only option left would be an arduous individual review of each case file. But even this would not be sufficient, as no mere ministerial review of case files could resolve the difficulty created by the fact that the two waiver programs, and the services offered thereunder, are geared toward individuals with different levels of need. [Filing No. 95-1, at ECF p. 2.] Indeed, Plaintiffs acknowledge that the two waivers do not offer the same services and that some putative class members are receiving services under the FS Waiver that are not the same as those under the A&D Waiver. [Filing No. 105, at ECF p. 22.] These qualitative differences alone ultimately undermine any value an individual's prior A&D Waiver budget has for determining the services individuals require when enrolled in the FS Waiver.

For all of the foregoing reasons, "there is no way to know or readily ascertain who is a member of the class." *Jamie S.*, 668 F.3d at 495. The only way to identify individuals who require more services each year than are available through the FS Waiver is via a Court mandated individualized inquiry into the specific needs of each enrollee. And when this is the case, the

putative class is not sufficiently ascertainable to permit certification.  *See id.* at 495-96.  Accordingly, Plaintiffs Motion to Certify must be denied.

**B.     Federal Rule of Civil Procedure 23(a)**

Even if the Court assumes that the putative class is sufficiently ascertainable, Plaintiffs have also failed to establish that the four Rule 23(a) requirements are met.  Rule 23(a) sets out four threshold requirements for class certification: "(1) numerosity (a class [so large] that joinder of all members is impracticable); (2) commonality (questions of law or fact common to the class); (3) typicality (named parties' claims or defenses are typical . . . of the class); and (4) adequacy of representation (representatives will fairly and adequately protect the interests of the class)." *Kress v. CCA of Tenn., LLC*, 694 F.3d 890, 892-93 (7th Cir. 2012) (alteration in original) (citation and quotation marks omitted).  Plaintiffs bear the burden of proving that these four requirements are met.  *See Oshana*, 472 F.3d at 513.  The parties dispute whether Plaintiffs have established any of the four Rule 23(a) requirements.  The Court will address the four requirements out of order, beginning with commonality as that element predominated the parties' arguments.  After concluding that commonality is not met, the Court briefly addresses the remaining three requirements.

*1.     Commonality*

Commonality requires there to be "questions of law or fact common to the class," Fed. R. Civ. P. 23(a)(2), although "even a single common question will do," *Wal-Mart Stores, Inc., v. Dukes*, 131 S. Ct. 2541, 2556 (2011) (alterations, citations, and quotation marks omitted).  "But the Supreme Court explained in *Wal-Mart* that superficial common questions—like . . . whether each class member 'suffered a violation of the same provision of law'—are not enough." *Jamie S.*, 668 F.3d at 497 (quoting *Wal-Mart*, 131 S. Ct. at 2551).  Instead, Plaintiffs' "claims must de-

- 22 -

pend upon a common contention . . . [t]hat . . . must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." _Wal-Mart_, 131 S. Ct. at 2551. In this sense, "the raising of common 'questions'—even in droves," is not enough; the key to commonality is whether a classwide proceeding can "generate common _answers_ apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." _Id._ (emphasis in original) (citation and quotation marks omitted).

An analysis of the Rule 23(a) prerequisites, including commonality, will "[f]requently . . . entail some overlap with the merits of the plaintiff's underlying claim." _Id._; _see Jamie S._, 668 F.3d at 498 (relying on _Wal-Mart_ when analyzing the merits of the plaintiffs' claims in deciding whether commonality was met). The Supreme Court's consideration of the merits of the plaintiffs' claims in _Wal-Mart_ provides this Court with guidance as to how the merits can impact the commonality inquiry. In that case, the Supreme Court found that commonality was not met in a nationwide class action on behalf of female Wal-Mart employees who alleged sex discrimination under Title VII. _See Wal-Mart_, 131 S. Ct. at 2547. The Supreme Court reasoned:

> In this case, proof of commonality necessarily overlaps with respondents' merits contention that Wal-Mart engages in a pattern or practice of discrimination. That is so because, in resolving an individual's Title VII claim, the crux of the inquiry is the reason for a particular employment decision. Here respondents wish to sue about literally millions of employment decisions at once. Without some glue holding the alleged _reasons_ for all those decisions together, it will be impossible to say that examination of all the class members' claims for relief will produce a common answer to the crucial question _why was I disfavored_.

_Id._ at 2552 (emphasis in original).

a.   The legal standard for an integration-mandate claim

To assess whether commonality is met, the Court must begin with Plaintiffs' legal claim. Plaintiffs' sole legal claim is that the 2011 Policy Change—by which they were transferred from the A&D Waiver to the FS Waiver—violates the integration mandate found in the ADA and the Rehabilitation Act. [Filing No. 1, at ECF p. 17-18 ("The elimination of persons with developmental disabilities who do not . . . routinely require skilled nursing services[] from the A&D Waiver violates the 'integration mandate' of the [ADA] and the Rehabilitation Act.").] The integration mandate found in the ADA and Rehabilitation Act are substantively identical, and thus the Court treats them as such. *See Amundson ex rel. Amundson v. Wis. Dep't of Health Servs.*, 721 F.3d 871, 872 (7th Cir. 2013) (treating them as identical); *see also Radaszewski ex rel. Radaszewski v. Maram*, 383 F.3d 599, 607 (7th Cir. 2004) (noting that the "ADA's integration regulation is modeled after [the Rehabilitation Act's] regulation" and thus "courts construe and apply them in a consistent manner").

The integration mandate has its statutory roots in the anti-discrimination provision of the ADA. *See Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 587 (1999). This provision states: "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. In *Olmstead*, the Supreme Court assessed whether this provision "may require placement of persons with mental disabilities in community settings rather than in institutions," and answered with "a qualified yes." 527 U.S. at 587. It held that "[s]uch action is in order when the State's treatment professionals have determined that community placement is appropriate, the transfer from institutional care to a less restrictive setting is not opposed by the affected individual, and the placement can be rea-

- 24 -

sonably accommodated, taking into account the resources available to the State[7] and the needs of others with mental disabilities." *Id.*; *see Radaszewski*, 383 F.3d at 607 (stating that *Olmstead* "held that the 'unjustified institutional isolation' of a disabled individual receiving medical care from a State amounts to an actionable form of discrimination under Title II") (quoting *Olmstead, 527 U.S. at 597-603*).

As *Wal-Mart* teaches, important to assessing commonality is defining the specific harm a plaintiff must suffer to have a cognizable integration-mandate claim; this is necessary to determine whether a classwide proceeding can "generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart*, 131 S. Ct. at 2551. Plaintiffs argue as if a cognizable integration mandate claim lies any time a State reduces an individual's services. Specifically, Plaintiffs contend that the integration mandate extends not only to those who are subject to "unjustified institutional isolation," *Olmstead*, 527 U.S. at 600, but also to "person[s] for whom participation in community life is curtailed, even if they are able to remain living in their own homes." [Filing No. 105, at ECF p. 17 n.8.] As confirmed by the Court at the hearing, Plaintiffs' only authority for this proposition are two out-of-circuit district court cases, [*see* Filing No. 105, at ECF p. 17 n.8 (citing *Lane v. Kitzhaber*, 841 F.Supp.2d 1199, 1205 (D. Or. 2012); *K.M. ex rel. D.G. v. Hyde Park Cent. Sch. Dist.*, 381 F.Supp.2d 343, 360 (S.D.N.Y. 2005))]. Plaintiffs agreed that the Seventh Circuit has never ascribed to this view of the integration mandate. Indeed, in *Amundson*, the Seventh Circuit suggested that actual institutionalization is required.

The plaintiffs in *Amundson* alleged that Wisconsin's cuts to services provided to the developmentally disabled violated the integration mandate. 721 F.3d at 872. The Seventh Circuit

---

[7] The parties did not focus on the interplay between *Olmstead*'s availability of resources factor, the waiver language requiring cost neutrality, and the joint federal/state pay structure of the Medicaid plan, so the Court will not either. While it may be an issue the parties reserve for the merits, it looms large on the horizon.

held that this claim was not ripe because "[n]one of the plaintiffs has been placed in an institu-tion," *id.* at 873, and thus "there [was] no legal injury," *id.* at 874. Although other circuits have held that the integration mandate covers those that are "at risk of institutionalization," *e.g.*, *Pash-by v. Delia*, 709 F.3d 307, 322 (4th Cir. 2013), *Amundson* suggests that an individual asserting an integration-mandate claim must face institutionalization before a claim can be brought, *see* 721 F.3d at 874 (stating that if Wisconsin cut services "without landing any developmentally disabled person in an institution," it "has fulfilled its obligation under federal law").[8] Therefore, in as-sessing whether commonality exists, the Court will apply the integration-mandate standard of institutionalization suggested in *Amundson* rather than Plaintiffs' proposed standard of curtail-ment of services.

### b.   Plaintiffs' proposed common questions are insufficient

Plaintiffs contend that commonality is met because a common question of law exists. [*See* Filing No. 74, at ECF p. 31-32.] Specifically, Plaintiffs assert that all members of the puta-tive class "are subject to the 2011 Policy Change and their concomitant removal from the A&D Waiver." [Filing No. 74, at ECF p. 31.] The common question of law, say Plaintiffs, is "[w]hether these policies result in the violation of class-members' rights under the [ADA] and [Rehabilitation Act]." [Filing No. 74, at ECF p. 32.] But as *Wal-Mart* and *Jamie S.* made clear, "superficial common questions—like . . . whether each class member 'suffered a violation of the same provision of law'—are not enough." *Jamie S.*, 668 F.3d at 497 (quoting *Wal-Mart*, 131 S.

---

[8] The Seventh Circuit in *Amundson* held that the plaintiffs' claims were not ripe because none had yet "land[ed] . . . in an institution." 721 F.3d at 874. This too could present a problem for Plaintiffs' integration-mandate claim. Ripeness is usually an issue to be resolved ahead of oth-ers. But the State did not pursue a ripeness challenge, and it is possible that there may be an in-dividual in the putative class whose claim might be ripe under *Amundsen*. Because there are numerous other grounds on which to decide this motion, the Court will not pursue it at this time either.

Ct. at 2551).   Therefore, Plaintiffs' proposed common question of whether the 2011 Policy Change violated the integration mandate is stated at a level of generality too high to establish commonality.   Were this all Plaintiffs offered, the Court would not need to proceed further.   On reply, however, Plaintiffs further explain their view of commonality.

Although Plaintiffs' reply brief focuses primarily on assailing the State's arguments rather than setting forth what common question exists, they do attempt to clarify their view of how commonality is met.   Plaintiffs assert that the 2011 Policy Change is the "'glue' uniting the class." [Filing No. 105, at ECF p. 16.]   It is so, say Plaintiffs, because the 2011 Policy Change reduced putative class members' services such that "all class-members have either suffered unnecessary institutionalization or segregation, or are 'at serious risk [thereof].'" [Filing No. 105, at ECF p. 17 (quoting *Pashby*, 709 F.3d at 322); *see* Filing No. 105, at ECF p. 17 (arguing that "a person receiving fewer services designed to ensure community integration is, almost by definition, less integrated into the community").]

The Court must first reject Plaintiffs' attempt to present a common question that relates to putative class members' segregation or diminution in services.   As previously made clear, *Amundson* requires institutionalization to state a cognizable integration-mandate claim.   *See* 721 F.3d at 874.   This leaves Plaintiffs' contention that the 2011 Policy Change is the "glue" that holds the class together because it led to the "unnecessary institutionalization" of putative class members.   [Filing No. 105, at ECF p. 17.]   However, once the Court drills down on this contention, it is clear that this argument also lacks merit.

The Supreme Court in *Wal-Mart* focused on whether there was "some glue holding the alleged *reasons* for [the challenged employment] decision together" because the *reasons* for a given employment decision are what determines liability under Title VII.   *See Wal-Mart*, 131 S.

- 27 -

Ct. at 2552 ("[I]n resolving an individual's Title VII claim, the crux of the inquiry is 'the reason for a particular employment decision.'") (quoting *Cooper v. Federal Reserve Bank of Richmond, 467 U.S. 867, 876 (1984)*). Such is not the case here. Unlike Title VII, a successful integration-mandate claim, at least at the threshold, does not look to the reasons given for a decision, but whether the challenged State action—here, the 2011 Policy Change—caused the plaintiff to face institutionalization. *See Amundson*, 721 F.3d at 874. If, as Plaintiffs suggest, the 2011 Policy Change is the glue holding the class together, it would have to be the policy that caused the class members to face institutionalization such that "examination of all the class members' claims for relief will produce a *common answer* to the crucial question [did the 2011 Policy cause them to be institutionalized]." *Wal-Mart*, 131 S. Ct. at 2552. In other words, the "truth or falsity" of whether the 2011 Policy Change caused the institutionalization of class members must be "capable of classwide resolution" such that the Court can resolve the issue for "each one of the claims in one stroke." *Id.* at 2551.

Such a one-stroke resolution is impossible. First, there is no evidence that the 2011 Policy Change itself directly caused any of the putative class members to be institutionalized. This is unsurprising given that the 2011 Policy Change merely transitioned individuals who the State wrongly placed on the A&D Waiver to the FS Waiver, both of which are designed to allow enrollees to receive services in the community. [*See* Filing No. 58-5, at ECF p. 8; Filing No. 58-8, at ECF p. 2.] Therefore, the most that can be said about the 2011 Policy Change is that it caused some class members to receive fewer community-based services, which under *Amundson* is insufficient to establish an integration-mandate claim. In other words, it cannot be said that the 2011 Policy Change itself *caused* any class members to be institutionalized, and thus the 2011 Policy Change could not violate the integration mandate. This precludes the 2011 Policy Change

from being the "glue" holding the class claims together, as a policy that did not cause any legal harm cannot be "an issue that is central to the validity of each one of the claims." *Wal-Mart*, 131 S. Ct. at 2551; *see also Johnson v. Meriter Health Servs. Employee Retirement Plan*, 702 F.3d 364, 369 (7th Cir. 2012) (recognizing that commonality was not met in *Wal-Mart* because "no company-wide policy was being challenged," as one of the two company-wide policies to which the plaintiffs pointed "could not violate Title VII"). Accordingly, commonality is not met on this ground.

     c.  The class definition cannot be altered such that certification is warranted, as Plaintiffs' challenge to the 2011 Policy Change is misguided

  As a fallback, Plaintiffs suggest the Court can cure any problems by exercising its authority to refine the proposed class definition. *See, e.g.*, *Messner*, 669 F.3d at 825 (citing cases). But the problems with Plaintiffs' proposed class run deeper than the class definition; they are rooted in the misguided nature of Plaintiffs' contention that the 2011 Policy Change is the "glue" that renders the case certifiable. From the beginning, Plaintiffs have focused on the legality of the 2011 Policy Change, but this change is not the true reason for their alleged legal harm (the receipt of insufficient services such that institutionalization was required).[9] Instead, the 2011 Policy Change brought the FSSA's waiver programs in compliance with the express terms of the waivers. An unfortunate possible consequence of that change is that some developmentally dis-

_____

[9] Again, this is assuming that any of the putative class members actually face institutionalization. There is no evidence before the Court that this is the case. According to *Amundson*, if all that resulted from the 2011 Policy Change is that putative class members' services were reduced "without landing any developmentally disabled person in an institution," the State "has fulfilled its obligation under federal law." 721 F.3d at 874. And if this is the case, Plaintiffs' proposed class is fatally overbroad. *See Messner*, 669 F.3d at 825 ("[A] class should not be certified if it is apparent that it contains a great many persons who have suffered no injury at the hands of the defendant.") (citation and quotation marks omitted); *see also Oshana*, 472 F.3d at 514. The Court need not rest its decision on this ground, however, because there are several other more thoroughly briefed bases to deny certification.

abled individuals may receive fewer services.  Any legal challenge to that fact—again, assuming the receipt of fewer services caused at least some class members to face institutionalization—should not be predicated on the State's decision to comply with its waiver agreement with the federal government.  Instead, the true cause of any potential harm is the confluence of policies that apply to all FS Waiver enrollees that limit their services: (1) the FS Waiver's budget cap[10]; and (2) the enrollee's exclusion from the CIH Waiver (which, like the FS Waiver, is designed for individuals with developmental disabilities and is not subject to the FS Waiver's budget cap, [*see* Filing No. 58-7, at ECF p. 8; Filing No. 30-1, at ECF p. 2]]).

At least two problems prevent the Court from certifying a class to challenge the confluence of these policies.  First and foremost, Plaintiffs have not sought to challenge the policies, and it is of course not the Court's role to assert claims on Plaintiffs' behalf.  Second, even if the Court endeavored to do so, the record is insufficient to establish that commonality would be met for Plaintiffs' proposed class to pursue a challenge to these policies.

Commonality would not be present for such a class because there are several distinct scenarios that could preclude putative class members from receiving services under the CIH Waiver.  The record reflects at least three such scenarios: (1) their CIH Waiver applications were denied because they did not meet the eligibility criteria for placement on that waiver; (2) they failed to

---

[10] This budget cap is, at least in part, dictated by the requirement that each waiver be cost-neutral compared to the cost of serving waiver enrollees through a traditional Medicaid institutional placement.  *See* 42 U.S.C. § 1396n(c)(2)(D).  The Court highlights this fact to note that any injunction Plaintiffs seek could not countermand terms of the state-federal waivers that are dictated by federal law.

apply for placement on the CIH Waiver[11]; or (3) as Plaintiffs contend, the BDDS failed to inform them about, or affirmatively discouraged them from applying for, the CIH Waiver.[12] [*See* Filing No. 74, at ECF p. 9-13 (recognizing that putative class members "might receive services through the CIH Waiver" but that the placement criteria are rather limited and that there is evidence that BDDS has discouraged individuals from applying for services under that waiver).] Because the only cognizable[13] legal harm—institutionalization—could have been caused by the FS Waiver budget cap in conjunction with any of these three alternative scenarios, there would be no common question with a "*single answer*" for all the class members. *Jamie S.*, 668 F.3d at 497 (emphasis in original). In other words, no common question of law exists between two putative class members who face institutionalization, one because she does not meet the CIH Waiver's eligibil-

---

[11] This category also includes individuals who did not appeal their termination from the A&D Waiver. Plaintiffs acknowledge that some individuals who faced termination from the A&D Waiver due to the 2011 Policy Change were enrolled in the CIH Waiver. [Filing No. 74, at ECF p. 23.] And this includes at least one individual who appealed her termination from the A&D Waiver and was subsequently "offered a slot on the CIH Waiver." [Filing No. 74, at ECF p. 23 (citing Filing No. 59-34, at ECF p. 39-40).]

[12] Plaintiffs do not dispute or otherwise suggest that putative class members only fall into one of these categories. Indeed, the Court questioned Plaintiffs at the hearing regarding why putative class members should not be required to seek enrollment in the CIH Waiver before being able to argue that the State's policies are unlawful. Plaintiffs did not dispute that some putative class members did not pursue the CIH Waiver, but argued that whether they did or not is a matter of exhaustion and, further, that nothing in the law requires exhaustion before filing an integration-mandate suit. Regardless of whether this is true, the fact that some putative class members face a reduction in services and perhaps institutionalization due to their own inaction or either of the other two above stated reasons also undermines commonality in that it prevents there from being a common question of law that the Court could answer for the entire class "in one stroke." *Wal-Mart*, 131 S. Ct. at 2551.

[13] Again, the Court is mindful that Plaintiffs contend that any curtailment in participation in community life is a legal wrong, even if they are able to remain living in their own homes. As noted, relevant Seventh Circuit precedent requires institutionalization to support a violation. It is for the Seventh Circuit, not this Court, to determine whether the teachings of *Amundson* should be modified or expanded.

ity criteria and one because, although eligible, has (allegedly) had the CIH Waiver's existence hidden from her by the FSSA.

This would distinguish such a claim (had Plaintiffs made it) from other cases where courts have certified integration-mandate classes even after *Wal-Mart* and *Jamie S.* In those cases, a single state policy was challenged that directly caused the unnecessary institutionalization of disabled individuals. *Cf. Bolden v. Walsh Const. Co.*, 688 F.3d 893, 898 (7th Cir. 2012) ("This single national policy was the missing ingredient in *Wal-Mart*."). For example, in *Hamos* the court found that commonality was present because the plaintiffs challenged "whether the state provides intensive mental health treatment to children only in hospitals and institutions and fails to provide any intensive, individualized care that is community-based or in the home." 2014 WL 562637, at *11. The court explained, "According to the plaintiffs, the State covers intensive treatment only in an institutional setting and does not cover any home and community-based care other than weekly outpatient counseling and medication management. If this is so, then every plaintiff is suffering the same injury as a result of a general policy of the State—even if the services recommended for each patient vary among the class members." *Id.* Here, however, putative class member's injuries could be caused by at least any of the three above stated scenarios.

The Court follows this rabbit trail only to demonstrate that problems would still exist with class certification even if Plaintiffs had more appropriately focused their legal claim on the State's policies that truly cause their alleged harm. The fact remains, however, that this is not the legal claim Plaintiffs' chose to pursue. Instead, as detailed above, they challenged the 2011 Policy and presently maintain that it is the "'glue' uniting the class." [Filing No. 105, at ECF p. 16-19.] But merely identifying the 2011 Policy Change does not explain what common question

can be answered for the class "in one stroke," *Wal-Mart*, 131 S. Ct. at 2551, and is no different than the superficial question Plaintiffs originally proposed.  Accordingly, with respect to the claim Plaintiffs did pursue, they "have identified no common factual or legal question that satisfies the Rule 23(a)(2) standard." *Jamie S.*, 668 F.3d at 497-98.[14]

### 2.    *Numerosity, Typicality, and Adequacy of Representation*

Because Plaintiffs failed to carry their burden to establish commonality, the Court only briefly addresses the remaining three Rule 23(a) requirements: numerosity, typicality, and adequate of representation.  Beginning with numerosity, it requires the putative class to be "[so large] that joinder of all members is impracticable." *Kress*, 694 F.3d at 892 (alteration in original).  Plaintiffs go to great lengths to demonstrate that their proposed class is sufficiently numerous to render joinder impracticable.  [*See* Filing No. 74, at ECF p. 27-31.]  The Court, however, cannot adequately assess, let alone ultimately decide, whether numerosity is met.  This is because, for all the reasons discussed in Section III.A above, putative class members are not ascertainable.  If class membership is unascertainable, there is no basis for the Court to conclude that the putative class is "[so large] that joinder of all members is impracticable." *Kress*, 694 F.3d at 892 (alteration in original).  Therefore, the Court concludes that numerosity is not met.

The typicality requirement is met if the named Plaintiffs' claim "arises from the same event or practice or course of conduct that gives rise to the claims of other class members." *Oshana*, 472 F.3d at 514 (citation and quotation marks omitted).  As noted by the Supreme Court, "[t]he commonality and typicality requirements of Rule 23(a) tend to merge." *Wal-Mart*, 131 S. Ct. at 2551 n.5 (alteration in original) (citation and quotation marks omitted).  This is true

---

[14] Even though the merits of Plaintiffs' claims significantly overlap with the commonality inquiry, the Court expresses no view regarding the ultimate merits of any individual Plaintiffs' claim.  It only decides that the integration-mandate claim as framed does not present a common question of law, the answer of which could settle the matter for all members of the putative class.

here, as the same difficulties with Plaintiffs' attempt to establish commonality prevent them from establishing typicality.  As discussed at length regarding commonality, the harm alleged by Plaintiffs could be caused by a number of FSSA policies and actions, or even caused by putative class members' own choices.  The Court is therefore unable to conclude that typicality is met, as Plaintiffs' integration-mandate claim does not arise from the "same event or practice or course of conduct." *Oshana*, 472 F.3d at 514 (citation and quotation marks omitted).

Finally, the Court addresses whether "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  This inquiry is composed of two parts: "the adequacy of the named plaintiff's counsel, and the adequacy of representation provided in protecting the different, separate, and distinct interest[s] of the class members." *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 598 (7th Cir. 1993) (citation and quotation marks omitted).  To adequately represent the class, the representative plaintiff "must be part of the class and possess the same interest and suffer the same injury as the class members." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997) (citation and quotation marks omitted). The Court has no reason to doubt the adequacy of Plaintiffs' counsel.  However, "[t]he adequacy-of-representation requirement tend[s] to merge with the commonality and typicality criteria of Rule 23(a), which serve as guideposts for determining whether . . . maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Id.* at 626 n.20 (citation and quotation marks omitted).  For the same reasons the Court concluded that commonality and typicality are not met, the Court cannot conclude that all Plaintiffs' legal injuries were caused by the same policy such that they would adequately represent the interests

of absent class members.   Accordingly, the Court cannot conclude that the adequacy-of-representation requirement is met.

### C.        Federal Rule of Civil Procedure 23(b)(2)

The Court turns finally to whether the putative class is certifiable under Rule 23(b)(2). For many of the reasons already articulated above, the Court concludes that it is not.  This provides a third independent basis to deny Plaintiffs' Motion to Certify.

A class may be certified under Rule 23(b)(2) if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  "The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them."  Wal-Mart, 131 S. Ct. at 2557 (citation and quotation marks omitted).  Moreover, "[t]he injunctive or declaratory relief sought must be final to the class as a whole."  Jamie S., 668 F.3d at 499 (citation and quotation marks omitted).  "In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class.  It does not authorize class certification when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant."  Wal-Mart, 131 S. Ct. at 2557.

The difficulty with Plaintiffs' proposed class is revealed by Plaintiffs' lack of clarity regarding the relief sought and, correspondingly, an explanation of how that requested relief meets the requirements of Rule 23(b)(2).  In their supplemental opening brief, Plaintiffs do not identify the specific remedy they seek in arguing that Rule 23(b)(2) is met.  Instead, they merely assert that "this action concerns the enforcement of generally applicable practices of the State to indi-

viduals enrolled in Medicaid waiver programs.  The state has acted or refused to act on grounds applicable to the class as a whole."  [Filing No. 74, at ECF p. 35.]  Such a statement, even if otherwise sufficient, only addresses the first clause of Rule 23(b)(2).  It does not identify the relief sought or explain why that relief is "final" and "appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

The State responds by identifying two instances earlier in the litigation where Plaintiffs articulated the injunctive relief sought.  [Filing No. 97, at ECF p. 33.]  Specifically, the State notes that Plaintiffs' Complaint requested an injunction requiring the FSSA to continue providing the putative class services through the A&D Waiver, [Filing No. 97, at ECF p. 33 (citing Filing No. 1, at ECF p. 18)], and the Intervenor Plaintiffs' Complaint similarly requests an injunction requiring the FSSA to provide "adequate services" to the putative class members, [Filing No. 97, at ECF p. 33 (citing Filing No. 88-1, at ECF p. 15)].  The State argues that this type of relief fails to meet Rule 23(b)(2) for the same reasons that rule was not met in *Jamie S.*—namely, that the requested injunction would not be "final" because "the relief sought would merely initiate a process through which highly individualized determinations" would have to be made regarding what services are "adequate" for each putative class member.  [Filing No. 97, at ECF p. 33 (quoting *Jamie S.*, 668 F.3d at 499).]

When the Court pressed Plaintiffs at the hearing to articulate the precise injunctive relief sought, Plaintiffs were equivocal in that they offered two very different potential injunctions: (1) ensure that those terminated from the A&D Waiver as a result of the 2011 Policy Change have access to the services they need; or (2) require the State to inform all class members of the availability of the CIH Waiver and allow them to apply for it before they lose services.  Plaintiffs have never articulated, however—in their briefing or at the hearing—how either of these injunc-

tions meets the requirements of Rule 23(b)(2).  This failure alone precludes certification of the class.

But even if the Court inferred the reasons Plaintiffs believe these injunction to be sufficient, both proposed injunctions fall short of the Rule 23(b)(2) requirements.  For the same reasons the putative class is not ascertainable—particularly the difficulty in determining whether one "requires" more services than available on the FS Waiver—an injunction requiring the FSSA to ensure that those terminated from the A&D Waiver receive the services they require would "merely initiate a process through which highly individualized determinations of liability and remedy are made."  *Jamie S.*, 668 F.3d at 499.  Individuals are placed on a waiver program for which they qualify, after which they submit an individualized budget plan to the FSSA that it can either accept or reject.  [Filing No. 58-4, at ECF p. 6.]  Therefore, like the relief requested in *Jamie S.*, this "kind of relief would be class-wide in name only, and it would certainly not be final."  668 F.3d at 499.  Put differently, while such an injunction would affect the entire class, it would "require[] [at least hundreds if not thousands] of individual determinations of class membership, liability, and appropriate remedies."[15] *Id.*

Plaintiffs' other requested remedy fares no better.  Requiring the FSSA to inform all putative class members of the availability of the CIH Waiver would only potentially remedy the alleged legal violation for a subset of class members.  As made clear in Section III.B above, the alleged violation of the integration mandate is caused by a variety of FSSA policies or class

---

[15] Plaintiffs' reliance on *B.N. ex rel A.N. v. Murphy*, 2011 WL 4496510 (N.D. Ind. 2011), is misplaced.  In that case, the plaintiffs challenged the State's cap on respite care services.  *See id.* at *2-3.  The court concluded that Rule 23(b)(2) was met and, in doing so, rejected the State's argument that "respite care services are highly personalized" and "based on the needs of each individual client" because the plaintiffs were challenging a generally applicable policy of capping respite care services.  *Id.* at *5.  But as discussed at length above, and unlike in *B.N.*, putative class members in this case are not readily ascertainable; even if they were, the ultimate cause of any institutionalization they face is not uniform among putative class members.

members' inaction—namely, the FS Waiver budget cap combined with an individual's failure to receive services via the CIH Waiver. But there is no evidence of a single cause of the class members' failure to be enrolled in the CIH Waiver. Without such uniformity, different injunctions would be required to remedy the alleged legal violation depending on class members' particular circumstances. Rule 23(b)(2), therefore, could not be satisfied because no "*single* injunction or declaratory judgment would provide relief to each member of the class." *Wal-Mart*, 131 S. Ct. at 2557 (emphasis added).

For these reasons, Plaintiffs have failed to show that the putative class is certifiable under Rule 23(b)(2). Accordingly, this provides a third independent basis for denying Plaintiffs' Motion to Certify.

**IV.**

**CONCLUSION**

The Court is not unsympathetic to the developmentally disabled individuals who are being transitioned off of the more generous but inappropriate A&D Waiver, to a less generous waiver program that corresponds to their appropriate level of care following the 2011 Policy Change.  Based on the terms of the State's Medicaid Waivers that are approved by the federal government, the 2011 Policy Change was necessary to comply with the requirements of those waivers.  This change affected the services provided to a number of developmentally disabled individuals.  However, the proposed class definition makes class membership impossible to ascertain without a painstaking and highly individualized review of approximately 14,000 case files.  Moreover, even if class membership could easily be ascertained, Plaintiffs have failed to carry their burden of establishing the Rule 23(a) requirements, particularly due to their failure to identify a common question that unites them.  Finally, Plaintiffs have also failed to identify a single injunction that would allow the Court to vindicate any found violations of the integration mandate for the class as a whole, or in such a manner that the injunction would be final.  Accordingly, this case is not one where class treatment of the claims is warranted.

For these reasons, Plaintiffs' Motion for Permissive Intervention and to Join in Pending Motion for Class Certification is **GRANTED**, [Filing No. 88], and Plaintiffs' Motion to Certify is **DENIED**, [Filing No. 3].

- 39 -

**<u>Distribution via ECF only to all counsel of record</u>**