UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

THOMAS MAERTZ, COLTON COLE, AND CODY )
COLE, )
     *Plaintiffs-Intervenors*, )
)   No. 1:13-cv-00957-JMS-MJD
     *vs.* )
)
DEBRA MINOTT, IN HER OFFICIAL CAPACITY )
AS SECRETARY OF THE INDIANA FAMILY AND )
SOCIAL SERVICES ADMINISTRATION, *ET AL.*, )
     *Defendants*. )

## ORDER

For a number of years, the Indiana Family and Social Services Administration ("FSSA") had a policy in place that allowed developmentally disabled individuals to receive Medicaid waiver services through a waiver program applicable to individuals who needed nursing-facility level of care. To remedy this problem for individuals who did not meet the nursing facility level of care requirement, the FSSA changed its policy and began transitioning the inappropriately placed individuals to another waiver program for which they were eligible (the "Policy Change"). Plaintiffs are developmentally disabled individuals who, as a result of the Policy Change, were transitioned to a different waiver program. According to Plaintiffs, this transition caused a reduction in the waiver services they receive in their homes, which in turn reduced the number of hours per week that they could leave their homes to engage in activities in the community.

This suit challenges the Policy Change. The parties' cross-motions for summary judgment are currently pending before the Court, and the United States has filed a brief as an interested party that supports Plaintiffs' claim. Plaintiffs contend that the Policy Change violated the Americans with Disabilities Act's ("ADA") and Rehabilitation Act's so-called integration mandates, which require "[a] public entity [to] administer services, programs, and activities in the most integrated

setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d); *see* 28 C.F.R. § 41.51(d).

For the reasons explained below, the Court cannot conclude that Plaintiffs' integration-mandate claims are ripe for review.  The reason for this is simple: the integration mandate focuses on the setting in which services are administered, not the amount of services received.  Plaintiffs do not contend that the setting in which they receive services has changed as a result of the Policy Change, nor could they, as Plaintiffs, both before and after the Policy Change, received Medicaid waiver services at their homes.  Instead, Plaintiffs argue that the Policy Change caused a decrease in their ability to engage in activities in the community, which they maintain violates the integration mandate.

The Seventh Circuit has made clear that, absent institutionalization (or perhaps some other involuntary change to a less integrated setting), an integration-mandate claim is not ripe for adjudication.  This precedent, of course, binds this Court.  Because the Policy Change has not caused Plaintiffs to be either institutionalized or moved to a different setting in which they receive Medicaid waiver services, their integration-mandate claims are unripe and summary judgment in Defendants' favor is warranted.

The Court notes that Plaintiffs claim a significant hardship caused by the Policy Change[1] in Plaintiffs' lives and the lives of their family members who care for them.  Whenever government services that were previously provided no longer are, the toll it takes on those who rely on such services is often dramatic.  But the Court is bound by clear Seventh Circuit precedent in this case.  Although other circuits have applied standards to integration-mandate claims that are perhaps more

_____

[1] While Plaintiffs attribute the Policy Change to their current changed conditions, the evidence also shows the decisions by Plaintiffs and/or their caregivers have also contributed to their current circumstances.

favorable to Plaintiffs, it is for the Seventh Circuit, not this Court, to revisit or clarify its position on the issue should it choose to do so.  *See Resier v. Residential Funding Corp.*, 380 F.3d 1027, 1029 (7th Cir. 2004) (stating that in our "hierarchical system, decisions of a superior court are authoritative on inferior courts").  But the appellate court's current position is clear.  Accordingly, Defendants' Motion for Summary Judgment is **GRANTED**, [Filing No. 143], Plaintiffs' Cross Motion for Summary Judgment is **DENIED**, [Filing No. 145], and Plaintiffs' integration-mandate claims are dismissed without prejudice because they are unripe.[2]

# I.
## STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits.  Fed. R. Civ. P. 56(c)(1)(A).  A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1)(B).  Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated.  Fed. R. Civ. P. 56(c)(4).  Failure

---

[2] On this date the Court issues an order in a related case, *Beckem v. Indiana Family and Social Servs. Admin.*, Case No. 1:14-cv-668-JMS-MJD, that is substantially identical to this Order.  The Court held a joint hearing on the pending cross-motions for summary judgment in these two cases during which both parties, and the United States as an Interested Party, presented argument.  In both cases, the plaintiffs raise essentially the same claims against the same defendants, and the parties stipulated that the discovery in Case No. 1:13-cv-957-JMS-MJD may be treated as if it were produced in Case No. 1:14-cv-668-JMS-MJD.

to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. Hampton v. Ford Motor Co., 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. Harper v. Vigilant Ins. Co., 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L.Ed. 202 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. Johnson v. Cambridge Indus., 325 F.3d 892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. Nelson v. Miller, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. Darst v. Interstate Brands Corp., 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. O'Leary v. Accretive Health, Inc., 657 F.3d 625, 630 (7th Cir. 2011). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to

the summary judgment motion before them," *Johnson*, 325 F.3d at 898.  Any doubt as to the ex-

istence of a genuine issue for trial is resolved against the moving party.  *Ponsetti v. GE Pension*

*Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

"The existence of cross-motions for summary judgment does not, however, imply that there

are no genuine issues of material fact."  *R.J. Corman Derailment Servs., LLC v. Int'l Union of*

*Operating Engineers*, 335 F.3d 643, 647 (7th Cir. 2003).  Specifically, "[p]arties have different

burdens of proof with respect to particular facts; different legal theories will have an effect on

which facts are material; and the process of taking the facts in the light most favorable to the non-

movant, first for one side and then for the other, may highlight the point that neither side has

enough to prevail without a trial."  *Id.* at 648.

## II.
### BACKGROUND

The Court draws the factual background from the undisputed evidence submitted by the

parties.  The parties dispute several facts, and vigorously dispute what conclusions should be

drawn from those facts.  The Court sets forth the disputed facts in the light most favorable to

Plaintiffs, since the Court ultimately grants summary judgment in Defendants' favor.[3]

### A.    The Medicaid Waiver Programs and the FSSA's Policy Change

This case involves Medicaid waiver programs funded jointly by the federal government

and the State of Indiana.  These programs allow states such as Indiana to waive certain federal

Medicaid requirements.  *See generally* 42 U.S.C. § 1396n.  A subset of these programs—home-

---

[3] Portions of the Background section here are taken from the Background section of the Court's
order denying class certification in this case.  [*See* Filing No. 112.]  The parties rely on evidence
submitted in support of class certification, and thus the Court will do so as well.

and-community-based waiver programs—"permit[] a State to furnish an array of home and community-based services that assist Medicaid beneficiaries to live in the community and avoid institutionalization." [Filing No. 58-5 at 8.] The FSSA submits waivers for approval to the United States Department of Health and Human Services ("DHHS"). [Filing No. 58-2 at 4.] Relevant to this litigation are three such waiver programs currently administered by the FSSA: the Aged and Disabled Waiver ("A&D Waiver"), the Community Integration and Habilitation Medicaid Waiver ("CIH Waiver"), and the Family Supports Medicaid Waiver ("FS Waiver"). [Filing No. 58-2 at 4; Filing No. 58-4 at 4.] The FSSA's Division of Aging administers the A&D Waiver, while the FSSA's Bureau of Developmental Disabilities Services ("BDDS") administers the CIH Waiver and the FS Waiver. [Filing No. 58-2 at 4; Filing No. 58-4 at 4.] An individual may only be enrolled in (and thus receive services from) one waiver program at a time. [Filing No. 58-2 at 4.]

Although not the focus of this lawsuit, individuals with disabilities also receive—in addition to waiver services—what the parties here refer to as prior authorization services. [Filing No. 58-1 at 4.] These are health-related services that are provided wholly apart from the services provided through the Medicaid waiver programs, and, unlike the waiver services, cannot be used to provide services to disabled individuals that allow them to enter into the community. [Filing No. 58-1 at 4.] Plaintiffs in this case each received, and continue to receive after the Policy Change, prior authorization services.

Individuals enrolled in any of the waiver programs receive a case manager. [Filing No. 58-2 at 6; Filing No. 58-4 at 6.] To determine both the type and amounts of services an enrollee will receive through the waiver program, the case manager, the enrollee, and the enrollee's guardian evaluate the enrollee's particular circumstances to identify the enrollee's specific needs. [Filing No. 58-2 at 6; Filing No. 58-4 at 6.] The enrollee then submits her plan to the appropriate

administering agency—either the Division of Aging or BDDS—which can either approve or deny the request for services.  [Filing No. 58-2 at 6; Filing No. 58-4 at 6.]  An enrollee must have her requested services approved annually by the appropriate agency.  [Filing No. 58-2 at 6; Filing No. 58-4 at 6.]

A basic understanding of each waiver is necessary to understand the events underlying this suit.  The A&D Waiver "provides an alternative to nursing facility admission for adults and persons of all ages with a disability," specifically by providing services "for people who would require care in a nursing facility if waiver or other supports were not available."  [Filing No. 58-5 at 12.] Plaintiffs do not contend that they are eligible for, or should be placed on, the A&D Waiver.  Instead, the parties agree that the FS Waiver and CIH Waiver—operated by BDDS—are the waiver programs pertaining to individuals with developmental disabilities, such as Plaintiffs.

Both the FS Waiver and CIH Waiver provide "waiver services to participants . . . in a range of community settings as an alternative to care in an intermediate care facility."  [Filing No. 58-7 at 8; Filing No. 58-8 at 8.]  While the A&D Waiver is limited to those who require a nursing-facility level of care, the FS Waiver and the CIH Waiver serve individuals who require a different level of care: "intermediate care facility for individuals with intellectual disabilities" ("ICF/IID"). [Filing No. 58-7 at 7; Filing No. 58-8 at 7.]  Like the A&D Waiver, the FS Waiver and the CIH Waiver are reimbursed at set rates, [Filing No. 58-9 at 9-10], albeit not the same rates as services under the A&D Waiver, [Filing No. 58-9 at 2-4], and an enrollee has a services budget approved at least on an annual basis, [Filing No. 58-4 at 6-7].  The FS Waiver currently caps enrollee's budgets at $16,250 per year.  [Filing No. 58-4 at 18.]  The CIH Waiver, however, has a much higher budget cap, [Filing No. 30-1 at 2], given that it is a needs-based waiver and "individuals must meet emergency placement criteria to access [it]."  [Filing No. 58-9 at 77.]

- 7 -

The amount of services available under each of the three waivers is impacted by the statutory requirements that each waiver be cost-neutral compared to the cost of serving these enrollees through a traditional Medicaid institutional placement. *See* 42 U.S.C. § 1396n(c)(2)(D) (requiring that under each "waiver the average per capita expenditure estimated by the State in any fiscal year for medical assistance provided with respect to such individuals does not exceed 100 percent of the average per capita expenditure that the State reasonably estimates would have been made in that fiscal year for expenditures under the State plan for such individuals if the waiver had not been granted"). Furthermore, the FSSA can consider supports an individual receives from family members or otherwise in determining the amount of services an individual should receive. *See* 42 U.S.C. § 1396n(i)(1)(G)(ii)(I)(bb) (requiring states to ensure that their individualized care plans for Medicaid recipients "tak[e] into account the extent of, and need for, any family or other supports for the individual"); *see also* Filing No. 143-1 at 31 (stating, in the FS Waiver, that "the State determines whether or not the waiver services, in combination with other sources of coverages including . . . natural supports and other available community supports and resources, can adequately meet the needs of the individual and ensure his or her health, safety and welfare").

From 2006 to 2011, FSSA policy permitted individuals with developmental disabilities to be placed on the A&D Waiver even if they did not meet nursing-facility level of care. [Filing No. 58-9 at 27-32 (2006 A&D Waiver Policy Statement).] This decision contravened the express terms of the A&D Waiver approved by DHHS, which limited the A&D Waiver to individuals requiring nursing-facility level of care. [Filing No. 58-5 at 11.] In October 2011, the Division of Aging instituted the Policy Change that is the subject of this litigation. [Filing No. 58-9 at 32.] The Policy Change rescinded the FSSA's prior policy of allowing individuals with a developmental disability to enroll in the A&D Waiver even if they did not require nursing-facility level of care.

[Filing No. 58-9 at 32.]  Because some individuals on the A&D Waiver did not meet that level of care, the Division of Aging decided to transition enrollees to another waiver for which they were eligible.  [Filing No. 58-2 at 12.]  Specifically, the Division of Aging sought to transition those no longer eligible for the A&D Waiver to either of the two waiver programs administered by BDDS: the FS Waiver or the CIH Waiver.  [Filing No. 58-2 at 12.]

Plaintiffs were each subject to the Policy Change and the requisite transition from the A&D Waiver to the FS Waiver or the CIH Waiver.  There are four emergency placement criteria for placement on the CIH Waiver, and only the fourth is arguably applicable to Plaintiffs.  [Filing No. 143-2 at 47.]  The fourth criteria allows placement on the CIH Waiver if "[t]here are other health and safety risks, as determined by the division director, and alternate placement in a supervised group living setting is not available . . . ."  [Filing No. 143-2 at 47.]  Plaintiffs each applied for the CIH Waiver, but the FSSA concluded that none of them was eligible for placement on that waiver.  [Filing No. 143-7 at 2-3; Filing No. 145-2 at 7.]  There is no evidence that any of Plaintiffs administratively appealed that decision.

**B.    The Plaintiffs and the Policy Change's Impact**

The Policy Change affected each Plaintiff in related but distinct ways.  Plaintiffs Cody and Colton Cole are twin brothers who have cerebral palsy, which requires them to use power wheelchairs.  [Filing No. 145-2 at 1.]  Colton lives with his mother, Tamara Awald, and Cole lives in a house next door.  [Filing No. 145-2 at 1.]  Although the record evidence is unclear as to how many hours of services the Coles received while on the A&D Waiver, the Coles received "sufficient hours both to allow them to remain safe and secure [at home] . . . and to allow their providers to take them out into the community in order to help them become as independent as possible and to increase their opportunities for socialization."  [Filing No. 145-2 at 2.]  Specifically, the Coles

would use their A&D Waiver services "for a significant portions of almost every day" to go to the gym, grocery store, out to eat, shopping, and medical appointments. [Filing No. 145-2 at 2.]

Following the Policy Change, the Coles were transitioned to the FS Waiver and, under it, they together receive approximately twenty-one hours of FS Waiver services per week. [Filing No. 145-2 at 2.]  However, in monetary terms they receive more waivers services now ($16,530) than they did before the Policy Change ($10,871).  The Coles both continue to receive prior authorization services. [Filing No. 145-2 at 4.]  They no longer go into the community during the weekdays, but on weekends are "sometimes" able to go into the community. [Filing No. 145-2 at 4.]  The Coles' mother attests that, "[i]f it were not for [her] care, assistance, and supervision, there is absolutely no doubt that they both would require institutionalization." [Filing No. 145-2 at 7.]

Plaintiff Thomas Maertz is intellectually disabled and has cerebral palsy. [Filing No. 145-3 at 1.]  He lives with his sister, Francesca Kemp, who is employed by companies enrolled as service providers in the various waiver programs offered by the State of Indiana. [Filing No. 145-3 at 1-2.]  She was and remains Mr. Maertz's paid caretaker when he was enrolled in the A&D Waiver and, after the Policy Change, when he was transitioned to the FS Waiver. [Filing No. 145-3 at 2.]  Even when not being reimbursed for services, Ms. Kemp assists Mr. Maertz "during virtually all waking hours." [Filing No. 145-3 at 3.]  When he was enrolled in the A&D Waiver, Ms. Kemp provided Mr. Maertz approximately forty hours of waiver services per week and other clients twelve hours of services per week. [Filing No. 143-8 at 6; Filing No. 145-3 at 2.]  During this time, Mr. Maertz would enter the community on a daily basis to do activities such as going out to eat, visiting the flea market, going to the barber, and going window shopping. [Filing No. 145-3 at 2.]

- 10 -

Following Mr. Maertz's transition to the FS Waiver, Ms. Kemp now only provides ten to twelve hours of reimbursed services per week to Mr. Maertz.  [Filing No. 143-8 at 6.]  Ms. Kemp's current employer does not allow her to take Mr. Maertz into the community during the time in which she is reimbursed for services, though there is no evidence that the FS Waiver itself pre-scribes such limitation.  [Filing No. 145-3 at 4.]  As a result of these changes, Mr. Maertz is only able to go out into the community a few days per week.  [Filing No. 145-3 at 4.]

Ms. Kemp attests that if it were not for her "care and assistance, there is absolutely no doubt that [Mr. Maertz] would require institutionalization."  [Filing No. 145-3 at 4.]  In Mr. Maertz's view, he would receive adequate services if he was provided "services consistent with the level, amount, and type of those provided through the A&D Waiver."  [Filing No. 143-8 at 18.]

### III.
#### DISCUSSION

The primary dispute between the parties is whether Plaintiffs have a cognizable integration-mandate claim, given that they have not been institutionalized nor involuntarily moved to a differ-ent setting as a result of the FSSA's Policy Change.  The Court will therefore begin with the general legal standards for an integration-mandate claim, before setting out the parties' arguments regard-ing the integration-mandate claims Plaintiffs assert here.

The integration mandate, set forth in ADA and Rehabilitation Act regulations, provides: "A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."  28 C.F.R. § 35.130(d); *see* 28

C.F.R. § 41.51(d).[4]  This mandate has its statutory roots in the anti-discrimination provision of the ADA, *see Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 587 (1999), which states: "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.   In *Olmstead*, the Supreme Court assessed whether 42 U.S.C. § 12132 "may require placement of persons with mental disabilities in community settings rather than in institutions," and answered with "a qualified yes."  527 U.S. at 587.   It held that "[s]uch action is in order when [1] the State's treatment professionals have determined that community placement is appropriate, [2] the transfer from institutional care to a less restrictive setting is not opposed by the affected individual, [3] and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities."  *Id.*; *see Radaszewski*, 383 F.3d at 607 (stating that *Olmstead* "held that the 'unjustified institutional isolation' of a disabled individual receiving medical care from a State amounts to an actionable form of discrimination under Title II") (quoting *Olmstead*, 527 U.S. at 597-603).

Defendants' position in its Motion for Summary Judgment is straightforward:  the Court need not assess the *Olmstead* factors because the Seventh Circuit's decision in *Amundson* dictates that Plaintiffs must be subject to institutionalization before their integration-mandate claims are ripe, and Plaintiffs have not been institutionalized as a result of the Policy Change.  [Filing No.

---

[4] These regulations found in the ADA and Rehabilitation Act are substantively identical, so the Court will treat them as such.  *See Amundson ex rel. Amundson v. Wis. Dep't of Health Servs.*, 721 F.3d 871, 872 (7th Cir. 2013) (treating the regulations as identical); *see also Radaszewski ex rel. Radaszewski v. Maram*, 383 F.3d 599, 607 (7th Cir. 2004) (noting that the "ADA's integration regulation is modeled after [the Rehabilitation Act's] regulation" and thus "courts construe and apply them in a consistent manner").

144 at 9.] Therefore, Defendants contend that Plaintiffs' integration-mandate claims are unripe and summary judgment must be granted in their favor.

Plaintiffs do not dispute that none of them has been institutionalized, "insofar as their family-members have expended great efforts (at significant cost to their own physical, financial, and emotional well-being) to ensure that the necessary care and supervision formerly provided by the State is still provided." [Filing No. 146 at 18.] However, Plaintiffs maintain that the integration mandate is not "only implicated upon a demonstration that a person will require actual institutionalization"; instead, Plaintiffs argue that it "is also implicated upon a showing that a person has been 'institutionalized' in his own home by the State's failure to afford sufficient access to the community." [Filing No. 146 at 19.] Plaintiffs say further that, as "made abundantly clear by the Seventh Circuit's earlier decision in *Bruggeman ex rel. Bruggeman v. Blagojevich*, 324 F.3d 906 (7th Cir. 2003), *Amundson* is not dispositive." [Filing No. 146 at 18-19.] Plaintiffs point the Court to various authorities that purportedly support their position, including integration-mandate precedents from other circuits and the Department of Justice's ("DOJ") interpretive guidance on the integration mandate. [Filing No. 146 at 19.]

The United States,[5] as an Interested Party, argues that the decrease in services caused by the Policy Change places Plaintiffs at risk of institutionalization and urges this Court to follow the several other circuits that have held that a plaintiff need only allege a risk of institutionalization to state a ripe integration-mandate claim. [Filing No. 155 at 12-17.] Defendants respond that the standards adopted by the other circuits are contrary to *Amundson*. [Filing No. 159 at 5-7.]

---

[5] At the hearing, the Court asked the United States questions regarding its joint approval, with the State of Indiana, of the waiver programs implemented by Defendants and the requirement that they remain cost neutral. The United States' counsel, from the Department of Justice's Civil Rights Division, only replied that she was not appearing on behalf of the Center for Medicare and Medicaid Services, which approves the waiver programs on behalf of the federal government.

In the end, the Court agrees with Defendants that *Amundson* is dispositive and that Plaintiffs' integration-mandate claims are unripe.  To explain this conclusion, the Court will first address *Amundson* and the other Seventh Circuit precedents on which the parties rely.  Second, the Court will explain why Plaintiffs' novel integration-mandate theory is contrary to *Amundson* and the other authorities on which they rely.  Third, the Court will address why it is inappropriate to apply the integration-mandate standards adopted by other circuit courts of appeals.  Finally, the Court concludes with brief observations regarding Plaintiffs' evidence of causation.

## A.    Seventh Circuit Precedent Dictates that Plaintiffs' Claim is Unripe

The Seventh Circuit recently addressed when an integration-mandate claim becomes ripe in *Amundson*.  The plaintiffs in *Amundson* alleged that Wisconsin reduced the subsidies to its program that funds disabled persons living in group homes such that group-home providers were reimbursed at lower rates than before.  721 F.3d at 872-74.  According to the plaintiffs, this violated the integration mandate because the reduction in subsidies for the group-home providers "increase[d] the risk that they will be moved from group homes to institutions."  *Id.* at 874.  The Seventh Circuit pointed out that the plaintiffs "do not allege that *any* developmentally disabled person in Wisconsin has been moved, involuntarily, from group to institutional care.  Plaintiffs do allege that some of their number have been required to leave group settings where they would have preferred to remain, but they do not allege inability to find another group home willing to accept the level of reimbursement that the Wisconsin['s] . . . Program now offers."  *Id.* at 873-74.

Confronted with these allegations, the Seventh Circuit reasoned that if the reduction in subsidies did not "land[] any developmentally disabled person in an institution," then "Wisconsin ha[d] fulfilled its obligations under federal law, no matter how much plaintiffs prefer the comfort and amenities of the more-expensive group homes."  *Id.* at 874.  Because none of the plaintiffs

- 14 -

were moved from their group homes to institutional care, the Seventh Circuit concluded "there [was] no legal injury" and the plaintiffs' claims were unripe; if the plaintiffs later become involuntarily institutionalized, the Seventh Circuit noted, "they can return to court." *Id.*  In conclusion, the Seventh Circuit stated that a reduction-in-subsidies claim is tenable if the reduction "lead[s] to undue institutionalization," but absent this, such a claim "is not a theory of 'discrimination' at all[,] [but instead one] of absolute entitlement." *Id.* at 875.

The undisputed facts in this case demonstrate that Plaintiffs' claim is analogous to the unripe claim in *Amundson* in all material respects.  The Policy Change challenged in this case resulted in decreased or different waiver services to Plaintiffs, and consequently—at least according to Plaintiffs, as discussed further below—a reduction in their ability to leave their homes to participate in activities in the community.  But it is undisputed—and explicitly acknowledged by Plaintiffs—that the reduction in waiver services caused by the Policy Change has not resulted in Plaintiffs' institutionalization.[6]  [Filing No. 146 at 18; *see* Filing No. 145-2 at 7; Filing No. 145-3 at 4.] Simply put, the Policy Change did not alter the setting in which Plaintiffs receive their waiver services, let alone lead to their institutionalization:  both before and after the Policy Change, Plaintiffs received their waiver services at their homes.

---

[6] At the hearing, the Court asked the parties what in their view constitutes "institutionalization," and both parties agreed that institutionalization requires a change in setting.  Thus, even by Plaintiffs' own definition of the term, they were not institutionalized as a result of the Policy Change.

Given these facts, the similarity between this case and *Amundson* is striking.  In both cases a state effectively reduced services to the developmentally disabled,[7] but the reduction did not change the setting in which those individuals received services, let alone cause any of them to be institutionalized.  Developmentally disabled individuals in Wisconsin could still receive services in group homes (even if only in less expensive ones), and Plaintiffs here still receive waiver services in their homes (even if fewer than before the Policy Change).  As the Seventh Circuit made clear, if the challenged policy fails to "land[] any developmentally disabled person in an institution," then the state entity "has fulfilled its obligations under federal law."  *Amundson*, 721 F.3d at 874.  Such is the case here, and thus *Amundson*'s conclusion is equally applicable: Plaintiffs' integration-mandate claims are "unripe. . . .  If plaintiffs' fears [regarding institutionalization] come to pass, they can return to court.  If the fears do not come to pass, however, there is no legal injury, and an opinion today would be advisory."  *Id.*

Plaintiffs rely on several authorities to resist this conclusion.  However, only two of the many authorities they cite are from the Seventh Circuit.  First, Plaintiffs contend that "more apposite to the present case than *Amundson* is the Seventh Circuit's decision in *Bruggeman*."  [Filing

---

[7] As Plaintiffs rightly point out, in *Amundson*, unlike in this case, reimbursement rates to providers were reduced, rather than the actual budget for services available to a developmentally disabled individual, as has happened here.  But Plaintiffs draw too much from their suggestion that the plaintiffs in *Amundson* "alleged no reduction in their services whatsoever."  [Filing No. 146 at 20.] While this may be technically true, the Seventh Circuit explicitly noted that the practical result of Wisconsin's reduction in reimbursement rates caused the developmentally disabled the "largest cuts," and more specifically, that some of the plaintiffs were "required to leave group settings where they would have preferred to remain," even if they found another group home setting that would accept a lower reimbursement rates.  *Amundson*, 721 F.3d at 872-74.  Thus in both cases, the plaintiffs challenge a state policy that ultimately caused a reduction in services—whether in the form of a decrease in the individual's services budget (as here) or in the reimbursement rates to providers of services (as in *Amundson*), is a distinction without a difference.  At bottom, both sets of plaintiffs faced a reduction in services from the state, and this reduction did not lead to the institutionalization of either set of plaintiffs.

No. 146 at 20.]  In *Bruggeman*, the Seventh Circuit noted that the integration mandate entitles disabled persons "to care in the least restrictive possible environment," and reasoned that it is not paradoxical that a residential institution, in certain circumstances, could be more integrated than living at home.  324 F.3d at 911-12.  Given this, the Seventh Circuit acknowledged the plaintiff's claim—that "by failing to offer an alternative to the home the defendants [were] violating [the integration mandate]"—may be viable, but because the district court did not address that claim on the merits, remand was required.  *Id.* at 912.  According to Plaintiffs, *Bruggeman* stands for the proposition that the integration mandate "is triggered when a person is denied the ability to benefit from the most integrated setting possible, regardless of the physical structure of that setting."  [Filing No. 146 at 21.]

Although *Bruggeman* arguably supports this proposition, it does not support Plaintiffs' integration-mandate claim in this case.  The Seventh Circuit in *Bruggeman*, as in *Amundson*, focused on the setting in which services were provided.  The *Bruggeman* plaintiffs may have had a viable integration-mandate claim because, for them, a residential institution may have been a more integrated setting than their homes, and they alleged that the state was giving them only one option as to the setting of their services—their home.  *See Bruggeman*, 324 F.3d 911-12.  But here, the setting in which Plaintiffs receive their waiver services (their homes) has not changed as a result of the Policy Change, nor do Plaintiffs seek to receive services in another setting.  It was this same lack of a change in setting that drove the result in *Amundson*:  the plaintiffs' claim was unripe because the challenged policy allowed the plaintiffs to continue receiving their services in group homes and did not force them into institutions.  *See Amundson*, 721 F.3d at 872-74.  But unlike in this case and *Amundson*, the *Bruggeman* plaintiffs stated a potential integration-mandate claim because they explicitly alleged that the state was not providing services in an *alternative setting*.

- 17 -

Thus, *Bruggeman* fails to support Plaintiffs' position in this case, and it is not more apposite than *Amundson*.

The only other integration-mandate case from the Seventh Circuit addressed by the parties—*Radaszewski*—proceeds pursuant to the same framework as *Bruggeman*.  In *Radaszewski*, the Seventh Circuit held that judgment on the pleadings was inappropriate because the plaintiff could potentially show "that the services he seeks to receive at home are, in substance, already provided in the institutional setting," and his home was the most integrated setting appropriate for him.  383 F.3d at 600, 611.  In other words, an integration-mandate claim was viable in *Radaszewski* for almost the same reason it was in *Bruggeman*: the defendant was providing services in one setting (institutions), but not in the most integrated setting for the plaintiff (his home).

As explained above, both this case and *Amundson* do not fit within the framework for a viable claim set out in *Bruggeman* and *Radaszewski*.  The policies challenged in this case and *Amundson* did not change the setting in which the plaintiffs receive services, nor did the plaintiffs seek services in a different setting, while in *Bruggeman* and *Radaszewski* there was a viable integration-mandate claim because there were services offered in one setting that were not offered in the most integrated setting for the plaintiffs.  Therefore, Plaintiffs' reliance on *Bruggeman* and *Radaszewski* does not support their position.  When read with *Amundson*, these cases establish that an integration-mandate claim is viable only when the challenged policy necessitates a change in setting or provides services in one setting that are not offered in a more integrated one.  The Policy Change challenged here does neither, and thus Plaintiffs integration-mandate claim is unripe.  *See Amundson*, 721 F.3d at 874.

**B.      Plaintiffs' Novel Integration-Mandate Claim is Contrary to Seventh Circuit Precedent and the Other Authorities on Which They Rely.**

Plaintiffs maintain that integration-mandate claims are not limited to situations in which individuals are institutionalized or at risk of institutionalization.  The protection offered by the integration mandate, Plaintiffs argue, is much broader in that it "prohibits policies that isolate individuals in their homes."  [Filing No. 146 at 21-22.]  Therefore, although *Amundson* and most integration-mandate cases generally focus on institutionalization, Plaintiffs argue that it does not follow that these claims are so limited.  [Filing No. 146 at 22-23; Filing No. 152 at 13-17.]

Plaintiffs point to the language of the integration-mandate regulation itself and the DOJ's interpretation of their regulations to support their position.  Specifically, the integration mandate requires services to be administered "in the most integrated setting appropriate to the needs" of disabled individuals.  28 C.F.R. § 35.130(d); *see* 28 C.F.R. § 41.51(d).  The "most integrated setting" is "a setting that enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible."  28 C.F.R. Pt. 35, App. B.  The DOJ issued a "Statement on Enforcement of the Integration Mandate and *Olmstead*" in 2011, in which it explained that integrated settings "are located in mainstream society; offer access to community activities and opportunities at times, frequencies and with persons of an individual's choosing; afford individuals choice in their daily life activities; and, provide individuals with disabilities the opportunity to interact with non-disabled persons to the fullest extent possible."  [Filing No. 145-7 at 2.]

These authorities, however, do not vindicate Plaintiffs' broad reading of the integration mandate.  Like the Seventh Circuit authorities discussed above, the regulations and the DOJ's interpretation thereof focus on the *setting* in which services are provided.  Again, Plaintiffs do not challenge the setting in which Defendants provide waivers services; prior to the Policy Change Plaintiffs received services in their homes and they continue to do so.  Plaintiffs instead seek more

waiver services in the same setting.  Their Statement of Claims submitted to the Court before the instant summary judgment motions were filed makes this clear:  Plaintiffs "intend to prove at trial" that "[t]he level of services offered, provided, and/or available to the plaintiffs-intervenors as a result of their termination from the [A&D Waiver] violates the integration mandate."  [Filing No. 141 at 1.]  The regulations and the DOJ's interpretive guidance do not discuss the level of services provided, and thus Plaintiffs' reliance on them is misplaced.

When pressed on the issue at the hearing, Plaintiffs again recognized that the integration mandate is about the setting in which services are provided, not the amount of services provided; but Plaintiffs argued that at some point the distinction between the two types of claims collapses when a person receives so few services at their home that they rarely if ever can leave their home for activities in the community.  It may very well be true that services can be so dramatically cut that what was once the most integrated setting for an individual no longer is, and the individual may be entitled to services in another setting.  But this is not the case here.  Plaintiffs occasionally leave their homes for activities in the community, [Filing No. 145-2 at 4; Filing No. 145-3 at 4], and they seek more waiver services via this lawsuit so that they can do so more often.  Such a claim, at its core, is simply a claim for more services and has nothing to do with the setting in which services are provided.  A "more services" claim has never been recognized by the Supreme

Court or Seventh Circuit; indeed, both courts have disavowed such claims, reasoning that the integration mandate is only implicated by a difference or change in setting, not in services.[8]  *See Olmstead*, 527 U.S. at 603 n.14 ("We do not in this opinion hold that the ADA imposes on the States a standard of care for whatever medical services they render, or that the ADA requires States to provide a certain level of benefits to individuals with disabilities."); *Amundson*, 721 F.3d at 875 ("[Plaintiffs'] sole argument is that Wisconsin reduced their own subsidies.  Apart from the possibility (which is unripe) that the reduction may lead to undue institutionalization, this is not a theory of 'discrimination' at all.  It is a claim of absolute entitlement.").

Furthermore, an examination of what level of services is appropriate is contrary to the Seventh Circuit's caution in *Bruggeman* that "[t]he purpose of the [the integration mandate] is not to constitute the federal courts the supervisors of the care and treatment of disabled persons."  324 F.3d at 913.  Yet Plaintiffs' "more services" claim essentially asks the Court to do precisely that; if the Court accepted Plaintiffs' novel integration-mandate theory, it would have to assess the services provided to each Plaintiff under the FS Waiver and make a judgment as to whether the services available allow them to be sufficiently integrated into the community.  Yet Plaintiffs have

---

[8] For these same reasons, Plaintiffs' reliance on *Lane v. Kitzhaber*, 841 F.Supp.2d 1199 (D. Or. 2012), and, *K.M. v. Hyde Park Cent. Sch. Dist.*, 381 F.Supp.2d 343 (S.D.N.Y. 2005), is unpersuasive.  Plaintiffs maintain that these cases establish that the integration mandate "extends beyond actual institutionalization."  [Filing No. 146 at 23.]  This is true, but only in the limited sense that, as recognized in *Bruggeman*, the most integrated setting for a particular person may be in a residential institution rather than at home.  *See Bruggeman*, 324 F.3d at 911-12.  Critical to an integration-mandate claim is that there are two possible settings, one of which is more integrated than the other, and the challenged state policy or action has rendered the more integrated setting unavailable to the plaintiff.  The district court cases on which Plaintiffs rely support this proposition, but no more, at least as it relates to Plaintiffs' claims here.  *See, e.g.*, *Lane*, 841 F.Supp.2d at 1205-08 (holding that the plaintiffs stated a viable integration-mandate claim by alleging that the defendants provided employment services only in sheltered workshops instead of providing services to allow for supported, integrated employment programs, and dismissing other claims based on "inadequate services").

- 21 -

not proposed to the Court—let alone provided any authority on the point—a baseline against which the Court would measure whether a certain level of community access is sufficient.  This is perhaps because, as explained above, integration-mandate cases consistently contrast two different settings in which disabled individuals seek services, not, as Plaintiffs urge here, an assessment of whether the level of services in a single setting permits an individual to participate in the community enough (whatever enough may be).

   In sum, because Plaintiffs' claim is about the amount of services they receive, rather than the setting in which they receive them, the authorities on which they rely do not support their novel integration-mandate claim.

### C.   Other Circuits' Integration-Mandate Standards Are Contrary to *Amundson*

   The United States (as an Interested Party), and Plaintiffs to a lesser extent, argues that the decrease in services caused by the Policy Change places Plaintiffs at risk of institutionalization and urges this Court to follow the several other circuits that have held that a plaintiff need only allege a risk of institutionalization to state a ripe integration-mandate claim.  [Filing No. 155 at 12-17.]  Defendants respond that the standards adopted by the other circuits are contrary to *Amundson*.  [Filing No. 159 at 5-7.]

   Three circuits have held that plaintiffs can proceed with an integration-mandate claim if the state policy or conduct they challenge has made them "at risk of institutionalization."  *Pashby v. Delia*, 709 F.3d 307, 322 (4th Cir. 2013); *see M.R. v. Dreyfus*, 663 F.3d 1100, 1102 (9th Cir. 2011); *Fisher v. Okla. Health Care Authority*, 335 F.3d 1175, 1181-82 (10th Cir. 2003).  The Court, however, cannot adopt this standard because the Seventh Circuit was clear in *Amundson* that actual institutionalization was necessary before an integration-mandate claim is ripe.  *See*

*Amundson*, 721 F.3d at 874 (holding that the plaintiff's integration-mandate claim was unripe because the challenged reduction in subsidies did not "land[] any developmentally disabled person in an institution"). The Seventh Circuit explicitly noted that the plaintiffs in *Amundson* feared institutionalization, "but their fears may be unwarranted." *Id.* "If the fears do not come to pass," the Seventh Circuit continued, "there is no legal injury." *Id.* Thus, contrary to the United States' position otherwise, the Seventh Circuit focused on whether any of the plaintiffs were actually institutionalized, not their risk of institutionalization.

Further reinforcing this reading of *Amundson* is the fact that the plaintiffs in that case explicitly argued to the Seventh Circuit that it should adopt the "risk of institutionalization" standard, and they cited the very circuit cases and DOJ interpretive guidance relied on by Plaintiffs and the United States here. *See Amundson v. Wis. Dept. of Health Servs.*, No. 13-1351, Dkt. 14-1 at 30-38; Dkt. 31 at 5-6. The plaintiffs in *Amundson* set forth "several examples" to the Seventh Circuit of how the challenged Wisconsin policy caused them to be at risk of institutionalization. *Id.* Nevertheless, the Seventh Circuit did not analyze any of the plaintiffs' individual situations to determine whether they were at risk of institutionalization. *See Amundson*, 721 F.3d at 873-84. This is because the Seventh Circuit's analysis was categorical: absent actual institutionalization, the plaintiffs' integration-mandate claims were unripe. *See id.* The Seventh Circuit noted that if the perceived risk of institutionalization came to fruition, the plaintiffs could "return to court" at that time. *Id.* Therefore, following *Amundson*, it would be improper for this Court to adopt a "risk of institutionalization" standard.

- 23 -

**D.    Even If Plaintiffs' Novel Integration-Mandate Claim Was Viable (Which It Is Not), Plaintiffs Have Not Established that the Policy Change Caused Their Decreased Community Activities.**

The foregoing analysis assumes that the Policy Change caused Plaintiffs to enter into the community less frequently than they were able to before the Policy Change because Plaintiffs' claims are unripe even if this is true.  The Court wishes to briefly highlight, however, that the evidence does not necessarily bear this out.  Although there is evidence that Plaintiffs each enter into the community less frequently than before the Policy Change, [Filing No. 145-2 at 4; Filing No. 145-3 at 4], whether this decrease was caused by the Policy Change is less clear.  The lack of clarity is in large part because Plaintiffs failed to delve into the precise changes in services the Policy Change caused them.  This left the Court to question counsel at the hearing regarding these changes.  Even after the hearing, however, the Court is left only with a limited evidentiary picture of how each Plaintiff was affected by the Policy Change in terms of how it directly impacted their ability to leave their homes for community activities.  The following examples explain why the Court has reservations regarding whether the Policy Change caused Plaintiffs' decrease in community activities.

Plaintiffs' briefing discussed the effects of the Policy Change strictly in terms of hours of waiver services received before and after the Policy Change.  But comparing only the hours of services received obscures the details of why Plaintiffs received the services they did before the Policy Change and why they choose to receive the services they do now.  For example, the parties at the hearing did not dispute that the Coles receive more waivers services now ($16,530) than they did before the Policy Change ($10,871) in strictly monetary terms.  It is further undisputed that individuals receiving waiver services may choose what services they wish to utilize, which are reimbursed at different rates depending on the service.  Given this, it is difficult for the Court

- 24 -

to conclude that the decrease in the Coles' participation in activities outside the home is caused by the Policy Change when the Coles chose not to use their *increased* waiver services budget to participate in the community—*e.g.*, for community habilitation services offered through the waivers that are designed to permit interactions with others.

Unlike the Coles, Mr. Maertz receives fewer waiver services now (~$16,000) than he did before the Policy Change (~$25,000). However, the fact that he rarely is able to leave his home to go into the community is due, at least in part, to the fact that the employer through whom Ms. Kemp provides waiver services to Mr. Maertz does not allow her to take Mr. Maertz into the community during the time in which she is reimbursed for services. [Filing No. 145-3 at 4.] Thus it appears—at least in part—that it is not the decrease in waiver services caused by the Policy Change that prevents Mr. Maertz from entering into the community more frequently, but the fact that Ms. Kemp is his sole provider of waiver services and her employer does not allow her to be reimbursed for services outside of the home. Simply put, if Mr. Maertz is choosing to utilize a provider for waiver services that precludes those services from being used outside the home, the Court would be hard pressed to conclude that Mr. Maertz's decrease in community integration is caused by the Policy Change.

In the end, the Court need not definitively decide whether sufficient causation is present because, as explained above, Plaintiffs' integration-mandate claims are unripe under *Amundson*. But even were this not the case, the foregoing evidentiary difficulties would create a significant stumbling block for Plaintiffs' claims.

### IV.
### CONCLUSION

Integration-mandate claims focus on the setting in which services to disabled persons are provided. Plaintiffs challenge Defendants' Policy Change via the integration mandate, but the

Policy Change has not altered the setting in which Plaintiffs receive Medicaid waiver services, let alone forced Plaintiffs into institutions.  The Seventh Circuit has made clear that the integration mandate is not implicated by a reduction in services to the disabled unless the individuals are institutionalized as a result of the reduction.  At the very least, the integration mandate requires the challenged reduction to impact the setting in which services are provided.  Plaintiffs here have not been institutionalized or had the setting in which they receive Medicaid waiver services impacted as a result of the Policy Change.  Until that occurs, Plaintiffs' integration-mandate claims are un-ripe.

The Court recognizes that Plaintiffs offer a novel theory of why the integration mandate is implicated:  the reduction in waiver services has decreased, although not foreclosed, Plaintiffs' ability to leave their homes to engage in activities in the community.  In this sense, Plaintiffs are less integrated into the community.  Such an argument, however, alters the focus of Plaintiffs' claims away from the *setting* in which they receive services to the *amount* of services they receive.  But the Supreme Court has made clear that the integration mandate does not require states to "provide a certain level of benefits to individuals with disabilities," *Olmstead*, 527 U.S. at 603 n.14, and the Seventh Circuit has rejected such a claim, describing it as one for "absolute entitlement," *Amundson*, 721 F.3d at 875.

The foregoing is not mean to minimize the hardship Defendants' Policy Change has allegedly caused Plaintiffs and their family caregivers, who provide both compensated and uncompensated care for their disabled family members.  But relevant precedent is clear.  And it is for the Seventh Circuit, not this Court, to expand the reach of the integration mandate beyond the boundaries the Seventh Circuit has set.

For these reasons, Defendants' Motion for Summary Judgment is **GRANTED**, [Filing No. 143], and Plaintiffs' Cross Motion for Summary Judgment is **DENIED**, [Filing No. 145].  Plaintiffs' integration-mandate claim is unripe and is therefore dismissed without prejudice.  Final Judgment shall issue accordingly.

DATE: June 9, 2015

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana


**Distribution via ECF only to all counsel of record**